OF THE

# Supreme Court of Appeals

## OF WEST VIRGINIA.

## Fall-Special Term, 1894.

## CHARLESTON.

STATE *v.* SHAWN.

Submitted June 23, 1894.—Decided November 24, 1894.

1. ARGUMENT OF COUNSEL—CRIMINAL LAW.

    Counsel necessarily must be allowed considerable latitude in the argument of a case, and, unless the court in a felony trial permits counsel for the state to so far transgress the rule of propriety as clearly to prejudice the prisoner, the judgment will not be reversed because of improper remarks by counsel made to the jury in argument.

2. ARGUMENT OF COUNSEL—REMARKS OF COUNSEL.

    Where a criminal trial is in other respects fair, a verdict of conviction will not be set aside by this Court for improper remarks of counsel, where it is plainly warranted by the evidence in the case under the law, and no other verdict could have been found without misconduct by the jury.

MONROE & WOODS for plaintiff in error, cited 20 W. Va. 32, 714; 34 Am. Rep. 751; 58 Am. Rep. 647 and notes; 56 Am.

Rep. 812; 48 Am. Rep. 336; 1 Am. St. Rep. 554; 5 Am. St. Rep. 882; 9 Am. St. Rep. 547; 11 Am. St. Rep. 512; 13 Am. St. Rep. 607; 19 Am. St. Rep. 310; 22 Am. St. Rep. 465, 673; 35 Am. St. Rep. 150; 27 Am. St. Rep. 103, 327.

ATTORNEY-GENERAL T. S. RILEY for the State, cited 31 W. Va. 493; 5 Am. St. Rep. 882.

W. B. CORNWELL for the State, cited Abbott's Trial Brief, 712 and authorities there cited.

BRANNON, PRESIDENT:

On the 30th day of September, 1893, Daniel Shawn was by the Circuit Court of Hampshire county sentenced to be hanged for the murder of Absalom Izer.

Daniel Shawn and Absalom Izer were brothers-in-law, having married sisters. They lived in McDowell's Hollow. about four miles south of the town of Romney, and about three fourths of a mile east of the river road. Their houses were about two hundred yards apart. They were engaged in getting out and hauling tan 'bark together, each man having for this purpose a team of two horses and a wagon. To get to their place from Romney, it is necessary to pass through the tollgate about a mile and a quarter from the town, and, keeping the river road for two or three miles, to turn to the left through a gate known as "McDowell's" gate, into the said McDowell's Hollow. From the said gate the road leads through the woods through the said hollow for about three-fourths of a mile, to the houses of said Shawn and Izer. Izer was a larger and stronger man than Shawn. On the 23d day of June, 1893, both men were in Romney, with their horses and wagons and their wives, Izer having also his son, and taking out with him in his wagon several friends. They had both been drinking during the day. Shawn needed another horse. A certain Abel High, having a horse to sell, was in town on the aforesaid 23d day of June, and was told by one Joseph A. Pancake that Shawn wanted to buy a horse, whereupon the said Pancake and High went to hunt for Shawn. They found him standing with Izer in front of the courthouse. High and Shawn then began to ar-

range the terms upon which the horse should be sold. Shawn stated that he would like to have six months in whch to pay for it; whereupon Izer interfered, and told Shawn that he should not have but till December; that he must have his (Izer's) bark hauled in by that time. Shawn replied that, by the terms of his contract with Izer, he had till the 1st of the next June to haul in said bark. Pancake advised them to go home and cool off, upon which Izer told him to shut his mouth, or he would slap it for him. To this Shawn made no reply whatever, but turned and left in a peaceable manner. Soon after, he left town in his wagon, with his wife. A witness, one Harmison, testified that on the day aforesaid, he was out in his stable, and heard loud talking and swearing. He looked out of the stable door, and saw Shawn driving furiously out of town, and heard him say, with an oath, "Some people can have anything they want, but I can't have anything." The witness heard Shawn's wife remind him that he was still within the corporation. Shawn replied that he would fix him at the tollgate. Shawn was beating his horse, and swearing. Witness heard prisoner mention no names, and could not say whether he referred to Izer or not. Witness was about two hundred yards from the prisoner. Shawn testified that he was exasperated at one of his horses at the time Harmison saw him, and that he was beating it, and swearing at it, and did not have a thought in reference to Izer at that time. When the prisoner got to the aforesaid McDowell's gate, he unhitched his horses, and left his wagon there, as was his custom; took the horses on up the hollow, and put them away. He then went into the house, took down his gun, and told his wife and mother that he was going to see Joe Pancake, and give him back his horse (which he had bought from him some time before, and had not paid for) and gears; that he was tired of this place; that he could not live here in peace; and that he was going some place where he could live in peace. He then went on down the hollow, and was next seen on the river road, at the aforesaid McDowell's gate. It was a habit of the prisoner to take his gun with him when walking alone. Just before the shooting, one James P. Stump passed Shawn sitting on the

roadside at the aforesaid gate. Witness asked the prisoner what he was waiting for, and prisoner answered that he was waiting to see Joe A. Pancake. Said Pancake had to pass along the river road to get to his home, from Romney. About five minutes after the witness Stump passed, Izer drove up in his wagon with his wife, little son, and several friends. His nephew was riding one of the horses, and driving. When Shawn saw Izer, he rose up, and said: "Aps Izer, what in the hell are you always putting your mouth in my business for?" Izer replied, "I haven't, Dan." Shawn then proceeded to swear some more, and make threats. Mrs. Izer testified that she got out of the wagon, and caught hold of the prisoner, and told him that his gun was scaring her son into spasms, and he answered that the gun would do no harm. She further entreated him for her sake, if not for "Aps'," not to shoot. The prisoner answered again that the gun would do no harm, and he pointed it to the ground. Izer told the boy to drive on. After a few more angry words addressed to Izer, he (Shawn) kneeled on one knee, and shot just as the wagon was going through the gate. Izer fell out of the wagon, upon the side of the road, dead. Shawn threw his gun down, almost striking Izer in the face, and said, "There's the damned old gun;" then, turning to Izer's wife, said, "Now, you can hang me, or do what you please with me;" after which he ran. Shawn himself testified that the above, as told by the witnesses for the state, was in the main correct, but that he was leaving the wagon when Izer, swearing at him, attempted to get out of the wagon, threatening to whip him, saying, "God damn you, son of a bitch, if I get out, I will fix you," when he shot. He also denied getting on one knee to shoot. Shawn had been sitting on the right side of the road, and Izer was on the right side of the wagon, during the quarrel at the said Mc-Dowell's gate. The shot took effect in the right side of the head, behind the ear, and in the right shoulder, rather behind. Some of the shot penetrated the brain, and caused death. Dr. Berkley, who held the post mortem examination, testified that Izer, in his opinion, had his back to prisoner, and was looking back at him. In the morning, Shawn

came to town, and gave himself up. There was no evidence produced on the trial as to the previous reputation of either Izer or Shawn.

The prisoner's motion for a new trial, because the verdict finding him guilty of murder in the first degree was not warranted by the evidence, must be overruled; for that verdict is fully and decidedly sustained by the facts.

But the chief ground on which the prisoner's counsel asks relief from his client's death sentence is on account of certain improper remarks by the prosecuting attorney in his closing argument before the jury. When the prosecuting attorney had finished his opening argument to the jury, in which he asked them to find an unqualified verdict of murder of the first degree, so that the penalty of death should be inflicted upon the prisoner, the counsel for the prisoner, admitting in their arguments that the evidence warranted a verdict of murder in the second degree, argued against the infliction of the death penalty, as asked for by the prosecuting attorney, and in favor of the alternative punishment of confinement for life in the state penitentiary. After the counsel for the prisoner had concluded their arguments to the jury, and when the prosecuting attorney was closing the argument for the state, having demanded in his argument an "unqualified verdict of murder in the first degree," or "the death penalty," he proceeded to argue against the alternative penalty of a life sentence in the penitentiary, because of the assumed fact that the prisoner, if sentenced to life imprisonment, would be liberated in a few years, and in this connection called the attention of the jury to the anarchists of Chicago and the action of the governor of Illinois, to which the prisoner, by his counsel, objected; and the court "suggested that the attorney was perhaps going too far away for examples," but gave the jury no instructions in reference thereto. Proceeding, he said: "If you sentence him to the penitentiary for life, it won't be five years till he will be let out on some excuse or pretext; and return home, to enter upon a new course of crime." He further said: "This (meaning the homicide for which the prisoner was on trial) is the grand culmination of an epidemic of crimes that

have been committed in this county." He further said, referring to the prisoner: "He is so steeped in crime that he has no friend to sit beside him during the trial."

There have been very many decisions in different states as to when improper remarks by counsel in advocacy before juries shall call for reversal and new trial. Detailed reference at large to them would be wearisome and useless. It is impossible upon such a subject to formulate a general rule infallibly applicable in all cases. Each case is tested by itself, in a measure. In *Shores' Case,* 31 W. Va. 491 (7 S. E. Rep. 413) this Court said; "Counsel must necessarily be allowed considerable latitude in the argument of a case, and unless the court, in a felony trial, permits counsel for the state to so far transgress the rule of propriety as clearly to prejudice the prisoner, the judgment will not be reversed because of improper remarks by counsel made to the jury."

The occurrences in great criminal trials are so many and diverse, the pressure, heat, and excitement of counsel in the struggle are often so intense, that it is well nigh impossible for counsel to guard themselves so exactly and scrupulously as to avoid some remarks outside the boundary of exact propriety, or for the court to be so actively alert as to prevent them; and, if this Court were in all cases of irregularity in this respect to overturn verdicts, few convictions would stand. Great latitude of argument is allowed in trials in this state; too much, I think. Counsel charged with the responsible duty of prosecuting parties charged with crime should remember that they are not merely advocates, but public officers, not bound to convict, but to do the prisoner justice as a debt due to him, and give him a calm, deliberate, fair trial, even though his counsel in his defense has transgressed the true line of advocacy. Their closing arguments are tremendous weapons against the unfortunate prisoner, tremendous to vindicate the cause of public justice, and tremendous to inflict injustice upon the helpless accused, if they are charged with passion and prejudice, or distort the law or facts, or bring in irrelevant or unproven facts. Some courts have been very sensitive upon this subject, and have reversed convictions in a few instances upon

apparently inadequate causes; but, as a general thing, reversals for this cause have been where there were gross abuses of the privilege of counsel. We must in each case look to the circumstances. Under the rule in this state, as propounded in *Shores' Case*, we must see that the case is one of improper conduct in counsel, and the impropriety such as "clearly to prejudice the prisoner." The Texas court, which has in various cases been very liberal to defendants in this matter, lays down the rule that "the abuse of counsel's privilege in argument, in order to warrant a new trial, must have been so gross as to prejudice the prisoner's rights." *McConnell* v. *State*, 58 Am. Rep. 647 and note (3 S. W. 699). In North Carolina the abuse by counsel must be gross and manifestly prejudicial to the prisoner. *State* v. *Underwood*, 77 N. C. 502. The current of authority elsewhere corresponds with these principles. In most instances where reversals have been ordered for remarks of counsel, the counsel stated and argued upon facts not in evidence bearing on the guilt of the accused, and in a few indulged in intemperate abuse of the accused. As a case must be tried by the evidence, the assertion of facts not proven calculated to influence the jury is generally effectual to establish error. But, with the exception of perhaps the statement that the prisoner was so steeped in crime that he had no one to sit beside him during his trial, such is not the case in this instance, and that statement was one based on and derivative from the evidence. Surely, we ought not to reverse a conviction, for what is simply a claimed inference or deduction from facts in evidence. The evidence showed a sedate and atrocious murder by the accused, and that his mind was so bent upon the bloody deed that the prayers and wails of the wife and child of his victim were powerless to stay his hand; and can it be that we must annul this trial because the prosecuting attorney, on these facts, declared him steeped in crime so that no friend was present to comfort him in his hour of trial? The evidence showed him wicked, and desperately bent on great crime. Strong language, but the facts were strong, and such language is com-

mon in the warmth and feeling of such trials.   Must a court reverse for every such passage?

The declaration by the prosecutor that, if the prisoner were sentenced to life imprisonment, he would be liberated in a few years, and would return home to enter upon a new course of crime, was no statement of fact bearing on the guilt of the accused, but a mere expression of opinion or guess, which the intelligence of the jury would rate only as such. And, indeed, was it a reprehensible opinion? The jury was the sole judge whether the prisoner should die or suffer lifelong imprisonment, as the law lodges that discretion with it. By what considerations is the jury to exercise this discretion? Certainly, it can look at the hue of the crime as revealed by the evidence; and can not the jury consider whether the circumstances of the crime show its perpetrator to be a desperate man, and an enemy of society, and dangerous, should he escape or be pardoned? The choice between the two modes of punishment, in case the jury find the crime murder in the first degree, is absolute with the jury, and it is difficult to limit the considerations which shall govern a jury if deducible from the nature of the crime and its perpetrator as manifested by the evidence. For myself, I can not say the remarks of counsel now in hand were legally condemnable. The reference to the pardon of the Chicago anarchists by the governor of Illinois was discounted and neutralized by the judge, and besides, and while irrelevant, the common sense of the jury would reject it; and it would be going far and according it undue influence to say that it figured as a factor in the decision of the jury. And, in addition to the weakness of the remarks above spoken of to affect the jury to the prisoner's prejudice, it is important to remember that they were called out from the prosecuting attorney by the fact that the prisoner's counsel had insisted upon a verdict in favor of life imprisonment instead of death, as I find it laid down in decisions in Michigan, North Carolina, and Vermont that improper remarks of counsel provoked by like remarks of opposing counsel, or in reply to such remarks, are not general-

ly regarded as calling for a reversal. Note on page 569, 9 Am. St. Rep.; *McDonald* v. *People* (18 N. E. Rep. 817.)

The statement by the prosecuting attorney that the crime was "the grand culmination of an epidemic of crimes that have been committed in this county" may be considered an appeal to local prejudice, was irrelevant, and ought not to have been made. It is the only matter that presents to me any question of seriousness in the case. But as to this and all the other remarks above stated we can not say that the prisoner was manifestly prejudiced or the verdict influenced by them. Here I refer again to the holding of this Court in *Shores' Case*, 31 W. Va. 491 (7 S. E. Rep. 413) that counsel must be allowed considerable latitude in argument, and, unless improper remarks are clearly to the prejudice of the defendant, there is no ground for a new trial; and that is especially the case with this Court. To justify reversal, it must appear that substantial rights of the party were prejudiced by the misconduct. Note to *McDonald's Case*, 9 Am. St. Rep. 569 (18 N. E. Rep. 817), citing *Shular* v. *State*, 105 Ind. 289 (4 N. E. Rep. 870); *Boyle* v. *State*, 105 Ind. 469 (5 N. E. Rep. 203); *Porter* v. *Throop*, 47 Mich. 313 (11 N. W. Rep. 174); and *State* v. *Robertson*, 26 S. 117 (1 S. E. Rep. 443). And, besides, it is important to consider that the circuit judge saw all the circumstances, surroundings, and phases of the trial, and did not regard these objections as calling for a new trial. It was well said in *Combs* v. *State*, 75 Ind. 221, that "to rigidly require counsel to confine themselves directly to the evidence would be a delicate task, both for the trial and appellate courts, and it is far better to commit something to the discretion of the trial court than to attempt to lay down or enforce a general rule defining the precise limits of the argument. If counsel make material statements outside of the evidence, which are likely to do the accused injury, it should be deemed an abuse of discretion and a cause of reversal; but when the statement is a general one, and of a character not likely to prejudice the accused in the minds of honest men of fair intelligence, the failure of the court to check counsel should not be deemed such an abuse of discretion as to require a reversal." In

*Huckshould* v. *Railroad Co.*, 90 Mo. 548 (2 S. W. 794) the court said: "The trial judge, who had heard the speeches of opposing counsel, and knew what, if anything, was said to provoke the last remarks of counsel in his closing speech, was in a better position than we are to determine whether he should or should not interfere; and as to when, how, and to what a trial judge may interfere in any case must depend on a sound discretion." In *Railroad Co.* v. *Gurley*, 12 Lea 46, cited in *Martin* v. *State*, 56 Am. Rep. 817, the court said: "The conduct of the trial must necessarily be left largely to the discretion of the presiding judge—a discretion which can not, in its very nature, be made a subject of review by this Court, except in a clear case of abuse of that discretion. If new trials were granted for remarks of counsel in the heat of debate, merely because they exaggerated the rights of the client, or went beyond the strict letter of the law, very few verdicts, we fear, would stand. These departures may generally be left to the criticism of opposing counsel in reply and the good sense of the jury in making allowance for the zeal of the speaker." Must we not attribute intelligence and discrimination to juries? They are capable of discarding improprieties. It would be impossible to carry on judicial proceedings upon the theory that everything, even if somewhat improper, that reaches the ears of jurors, affects their final determination beyond all power of resistance on their part. And there is a further weighty or conclusive consideration—the case made by the evidence was so strong against the accused that his counsel conceded before the jury that he was guilty of murder in the second degree, and virtually conceded it in the first degree, and only asked a verdict for a life term in the penitentiary, rather than death; and the evidence abundantly sustains the finding of murder in the first degree. If the remarks of counsel had not been made, the verdict ought to have been murder in the first degree. They could only bear on the mode of punishment, and we see that death is not an undue punishment for the deed, and the jury was vested with absolute discretion to impose it or not. This being so, ought we to set aside a verdict plainly right under the evidence, merely for

those remarks? There is no objection to the trial in any other respect. If the trial is in all other respects fairly conducted---and it is apparent that no other verdict could have been rendered without misconduct on the part of the jury---the verdict will not be set aside. Note to *McDonald's Case*, 9 Am. St. Rep. 569 (18 N. E. Rep. 817); *Lamar* v. *State*, 65 Miss. 93 (3 South. 78) *State* v. *Weiners*, 66 Mo. 13. In *Pence* v. *State* (Ind.) 58 Am. R. 651, note, the court said: "Upon the evidence, it seems to us that the conviction was at all events inevitable; and, as the punishment does not seem to have been out of proportion with the offense, we can not see that there could have been any prejudice to the substantial rights of the appellant. In such a case we are not authorized to reverse." Abb. Cr. Tr. Brief, § 712, is referred to as sustaining this doctrine, but it is not in our library.

Therefore, we are compelled to affirm the sentence.

As the day fixed in the judgment for the execution of the sentence of death has passed, owing to the pendency of this writ of error, the Circuit Court must cause the prisoner to be brought before it, and fix another day for execution, for which purpose the case is remanded to that court. Whar. Cr. Pl. & Pr. § 916; 2 Hawk. P. C. c. 51, § 7; 2 Bish. Cr. Proc. § 1311.

As judgments imposing the death penalty usually, if not invariably, in this state, specify the date of execution, it often happens that owing to appellate proceedings, that day passes, necessitating the fixing of another date. Just how this practice of naming the day in the sentence became established in Virginia is not certain, but likely from the form of judgment in murder cases adopted in June, 1752, by the judges of England, under section 3, chapter 37, of the statute 25 Geo. II., which required the judgment to specify the day of execution. 1 East Cr. Law, 373; 4 Bl. Comm. 202. And even under the act it was held that the requirement that the day be fixed in the judgment was directory, and did not form a necessary part of the sentence. *Rex* v. *Wyatt* (1812) Russ. & R. 229; 1 Chit. Cr. Law 782. That statute is not in force here, but, having been once in force in Virginia, the

practice under it has likely continued in use. Then, what is the English common-law on the point? It is certain that before said statute of Geo. II., the time and place of the execution of the death penalty constituted no part of the judgment. 1 Chit. Cr. Law 782; 2 Hale, P. C. 399; *Rex* v. *Rogers,* 3 Burrows 1812; Whart. Cr. Pl. & Pr. § 916; 1 Bish. Cr. Proc. § 1311; *Cathcart* v. *Com.,* 37 Pa. St. 115; 4 Am. & Eng. Enc. Law 728; *Webster* v. *Com.,* 5 Cush. 386. It is left to the sheriff to fix the time of execution, since, when the sentence is pronounced, he is charged in general language by the statute with simply the duty of execution, and it is not an essential part of the judgment. Act. Va. Dec. 12, 1792, c. 66, s. 17 (1 Va. Rev. Code, 1803, s. 19) enacts that, "to prevent misconstruction, it is hereby declared that the sheriff of the county in which any district court shall sit shall execute all judgments rendered by such court in any criminal case." So said 1 Rev. Code (1819) c. 69, s. 40, as to sentences by Circuit Courts. Code Va. (Ed. 1849 and 1860) c. 209, s. 9, broadly provides that a copy of the death sentence shall be delivered to the sheriff, "who shall cause the sentence to be executed." Just so in section 9, chapter 160, of our own Code. The statute contains nothing requiring the time to be fixed in the judgment, which need only to conform to the common-law. As said by the California court, delay and inconvenience would be avoided by omitting the date of execution in the judgment. *Murphy's Case,* 45 Cal. 137.

---

DENT, JUDGE, *(dissenting)*:

While I concur in the syllabus, I desire to enter my protest and dissent against the argument contained in the opinion and the conclusion reached by the court in this case.

The error complained of is that the prosecuting attorney, in his closing argument, having referred to the conviction, imprisonment, and pardon of the Chicago anarchists, said: "If you sentence the prisoner to the penitentiary for life, it won't be five years till he will be let out on some excuse or pretext, and return home to enter on a new course of crime." "This is the grand culmination of an epidemic of crimes

that have been committed in this county." "He is so steeped in crime that he has no friend to sit beside him during his trial." There was no evidence before the jury to justify any of these expressions. From them the jury might infer—and for this purpose they were evidently uttered—that the accused was guilty of many crimes, and this was the grand culmination of his wicked career, and that, if sent to the penitentiary, he would be back in five years, to repeat these crimes. What language could be stronger or more reprehensible? It was used for no other purpose than to arouse human passion, and prejudice the prisoner in the minds of the jury, converting them into an unreasonable mob, with vengeance in their hearts, rather than a calm deliberate tribunal of his fellow men, coolly reaching the unbiased verdict to which the law and evidence unerringly point.

The rule of the law is well settled that an attorney, through undue ardor to secure a conviction in accordance with his desires has no right to stir up the passion and prejudice of the jury by referring to matters irrelevant or facts not in proof. *Hatch* v. *State*, 34 Am. Rep. 751. Granting that the prisoner was guilty of murder in the first degree—which I do not pretend to dispute—the law, in tender consideration of human frailties, seeks to distinguish between the different degrees of depravity entering into each particular commission of the highest of crimes, and, in doing so, weighs the motives that led to the criminal act. That is to say, the man who kills because of bitter feelings rankling in his breast from a wrong or injury done him by his victim, even though it be imaginary, is not equally guilty with the man who kills in the commision of a felony, or for hatred of human kind generally, or for the love of human gore; hence the leniency of the law in permitting a jury to discriminate and fix the punishment of confinement in the penitentiary for life. The intemperate and unjustifiable language used by the prosecutor was to inflame the minds of the jury, and to prevent this discrimination on their part. He accomplished his purpose, which is the best evidence possible that the prisoner was prejudiced by his conduct.

In this case, while the killing was deliberate, the prisoner,

from his words and conduct, had even recently publicly suffered contumely and abuse on the part of his unfortunate victim, until life had become to him unbearable, and this injury, rankling in his heart, had driven him to desperation. His expression after the shooting is proof positive of this, when he says to his sister-in-law, "Now, you can hang me, or do what you please with me." These are the words of a man driven to dispair, and fully conscious that he had placed his life in jeopardy, and without attempting to escape, he gave himself up to be dealt with as his fellow men should determine. Can such a man be equally guilty with the monstor who destroys children because he hates the human race, or kills his wife and mother for their money, or, to satisfy his brutal lust, first outrages and then murders the victim of his horrible crime? Cain was a guiltier man, for he slew his innocent and confiding brother for an imaginary wrong; yet his maker permitted him to go free, though he denied his crime, with the admonition that, "whosoever slayeth Cain, vengeance shall be taken on him sevenfold."

The most solemn and awful duty that men are called upon to perform is to inflict the death penalty on their fellows, and it should be done only in extreme cases, when no other punishment will vindicate the law, and protect society against the totally depraved. The unwarranted, cruel and diabolical destruction of human life under the forms of law, even in the name of religion, by human agencies, has already been so great that, if entered up by divine justice against the human race as a race, must seal its eternal and everlasting condemnation. How careful, then, should we be, before we lend our sanction to the taking of life, that the accused has, beyond all reasonable doubt, had a fair and impartial trial before an unbiased jury of his fellow men, free from any undue influence of prejudice or passion. It is better that the guilty escape than any should be unjustly punished. And no man who is not totally depraved should be denied the opportunity which imprisonment for life affords him of repenting of his crimes, redeeming his life, and making preparation to stand before the bar of that all-wise

Judge, from whom no secret thing can be hidden, and who will condemn our disobedience to His statutes according to the standards we have created for our fellow men.

May He have mercy on the soul of Daniel D. Shawn when it is ushered into His presence in obedience to the final judgment of this Court.