# CHARLESTON.

STATE *v*. JIM HAYES

(No. 6606)

Submitted May 13, 1930. Decided May 31, 1930.

*Hubard & Bacon,* for plaintiff in error.

*Howard B. Lee,* Attorney General, and *R. A. Blessing* and *W. Elliott Nefflen,* Assistant Attorneys General, for the State.

LIVELY, PRESIDENT.

Jim Hayes prosecutes error to a judgment of the circuit court of Greenbrier county sentencing him to confinement for eighteen years on a verdict of murder in the second degree committed upon Snowden Crane.

Snowden Crane, 69 years old, and a bachelor, who lived near Bellburn in the western portion of the county, was brutally murdered in his home on the night of November 24, 1927, and his body secreted on a high hillside about 1,000 feet away. His skull had been fractured in two places, a bullet had penetrated the base of his brain emerging below an eye, his wrists were bruised as if by a cord, and there were bruises on both legs between the ankle and knee. A rawhide strap was found tied around his left ankle. The fractures on the skull as well as the gunshot wound were alike fatal. The room which Crane habitually occupied showed signs of a struggle. A broken shotgun was found in one of the rooms, and there were evidences that a search had been made, presumably for valuables.

Up to about the 15th of October prior to the murder, a small shanty on Crane's farm, about one-half mile from his home, had been occupied by Nellie Mays, and with her had lived Cody Allen, her paramour; John Allen (uncle of Cody), Hubert Allen, the son of John, and Lottie Adkins, who was Hubert's paramour. Andy Cade frequently came to the shanty

and consorted with its occupants. They lived, in the main, by questionable practices. Another shanty about twelve feet from the Nellie Mays shanty was occupied by Sylvia Bear and her husband. The Allen crowd had moved from the shanty to another part of western Greenbrier county about the middle of October, but Nellie Mays' household goods remained therein. Sylvia Bear and her husband continued to occupy the nearby shanty.

Cody Allen was suspected of complicity in the crime, and was arrested in Raleigh county in January, 1928, where he had gone to visit his father. He made a written confession in which he implicated as accomplices Ed Woodzell, a Mr. George, and an unknown man. After being taken to jail he changed his confession so as to relieve George, who had also been arrested and put in jail, and implicated defendant, Jim Hayes, who for five or six years had lived in the neighborhood of the crime. Hayes had gone to Kentucky, where he had obtained work through some relatives, and he was extradited, jailed, and afterwards indicted for the murder at a special term of court on April 10, 1928. He continued his case, and it was tried at the following July term when the jury failed to agree. At the April term, 1929, he was convicted and sentence imposed May 15, 1929. His defense was : (1) an alibi; and (2) that Cody Allen, John Allen, Andy Cade, Nellie Mays, and perhaps others of the Allen gang, committed the murder.

Cody Allen testified that on Monday night, November 21st (prior to the murder on the following Wednesday night), he met Jim Hayes, Ed Woodzell, and a man unknown to him called ''George'' in the vicinity of Crane's home, while on his way to the shanty where Nellie Mays had lived. They accosted him after parking their car on the roadside, and, after drinking some liquor, Hayes said he was ''going to stop Snowden Crane from telling damn lies on him,'' and offered the witness $100 if he would go with them and watch. He agreed to go, and they arranged to meet at East Rainelle on the following Wednesday night. He met them as agreed, and from there they drove in Hayes' car to a church where a path led to the Crane house, parked their car at the church, walked to the house, where he acted as a watch while the other three entered

the house. He then detailed what he saw them do, culminating in Hayes' hitting Crane on the head a time or so with what looked like a club, followed by a shot in the head from a pistol in Woodzell's hands. The three men then carried the body out in the direction of the hill (Cody remaining near the house as a watch), and upon their return they went into the house, and remained there some time, making a "considerable racket." After that they all went back to the hard road by a different route, and, after swearing secrecy to each other, separated; the witness receiving a pint of liquor, but no money as promised. He was told to "get out of the country." Hayes says he went to Fayetteville that day, and did not return to his home (situated about three-fourths of a mile from Crane's house) until night, and remained at home all night. In this he is corroborated by five or six witnesses, most of whom were closely related to him. Corroborating Cody Allen, and contradicting the alibi, is the evidence of E. S. Rexrode, a truck driver and mechanic of East Rainelle, who says that on the fatal Wednesday night, before Thanksgiving day, a stranger came into his garage and inquired the way to Snowden Crane's place. Afterwards, when Hayes came into the garage where he was working, he recognized him as the stranger who had made the inquiry. His identification is positive. J. L. Fitzwater, a storekeeper on the road from East Rainelle to the church (spoken of by Cody), says that on the Wednesday night two men came in his store (then strangers to him), and one inquired the way to Snowden "Haynes," but immediately changed it to Snowden Crane. The clothes of this man were described by him, and corresponded to the description of the clothes worn by the man who inquired of Rexrode. He afterwards identified Hayes as the man who had made this inquiry. It is argued that this evidence of Rexrode and Fitzwater is entitled to no weight; the argument being that it would be inconceivable for Hayes thus to advertise his presence in the vicinity of a contemplated crime, and make inquiry concerning a way quite familiar to him and which he had often traveled. The state argues that it was a shrewd scheme on his part to cast suspicion upon some strangers not familiar with the vicinity and its paths, and that his well-laid alibi would

exonerate him, if these witnesses should attempt to identify him, if, perchance, he was accused and extradited. The credibility and weight of this evidence and what were the motives which prompted Hayes in making the inquiries, and if made, were matters for jury determination, about which more will be said.

The state's evidence tends to show two motives for the visit to Crane's house, robbery (Crane was reputed to have money in his house), and revenge on the part of Hayes. Crane had been an important witness for the state in a prosecution for murder against Chase Brown, a brother-in-law of Hayes, and was, at the time of his murder, summoned as a witness in a new trial granted Brown. Hayes was a witness for his brother-in-law, Brown. Witness Sylvia Bear testified that Hayes had said: "If the Brown boys got a new hearing, Snowden Crane wouldn't hear it"; and witness Boyer, an employer of Hayes, testified that Hayes, on the Monday preceding the murder, had said: "Snowden Crane had told about all the damn lies on him he was going to tell." This evidence, coupled with that of Cody Allen to the effect that Hayes said, on the Monday night when Cody was employed as a watch, that he "was going to stop Snowden Crane from telling damn lies on him," is what the state argues as evidence of a motive on the part of Hayes, in addition to that of robbery as evidenced by the ransacked condition of the house after the murder.

As above stated, the defense, in addition to the alibi, attempted to show that the murder was committed by the Allen-Cade gang. After Hayes had been accused and extradited in July, 1928, two detectives, Simmons and McWhorter, accompanied by counsel for Hayes, appeared before McClung, a justice of the peace accompanied by Nellie Mays, Andy Cade, and John Allen. Warrants were sworn out by one of the detectives for Nellie, Andy, and John charging them with the murder of Crane, and were immediately served on them, and a like warrant was issued for Hubert Allen. Upon being arraigned, John Allen and Andy Cade plead guilty, and were held for indictment without bond, but Nellie Mays plead not guilty, and was also held. On the trial, Cade and John

Allen were introduced by the defense and interrogated about their alleged confessions before the justice. They were confronted by written confessions detailing their connection with the commission of the crime made by them to counsel and detectives, which confessions they repudiated as wholly untrue, saying they made the statements under threats from the detectives that, if they did not sign the confessions, they would "never see the sun rise again." Much evidence was later introduced to show that the alleged confessions could not have been true. One item of evidence will illustrate: Hubert Allen (a son of John) was at the commission of crime, according to the alleged confessions. The employer of Hubert, who operated a coal mine at Lookout, many miles distant from the scene of the crime, said that Hubert had worked in the mine on Wednesday for ten hours, and quit about nightfall, and it was shown by other witnesses that Hubert stayed all that night at Lookout. The alleged confessions of John Allen and Andy Cade contradict each other in important details, and their presence elsewhere on the night of the crime is testified to by themselves and corroborated by others. Nellie Mays (by the confession at Crane's house) that night was at Quinwood some miles away, and stayed at the home of a Mrs. Adams, according to her evidence and that of Mrs. Adams. While the detectives denied coercion or threats in obtaining the alleged confessions, and say they were freely and voluntarily made, there was ample evidence on which the jury would be warranted in finding that these alleged confessions were untrue, and brought into the trial for purposes favorable to Hayes.

Much evidence was introduced by the defense to contradict Cody Allen and to show that he was unworthy of belief. He made many statements which contradict his evidence given on the stand. One will illustrate: After he had been committed to the penitentiary, and before the last trial of Hayes, he wrote to counsel for Hayes to the effect that he understood that counsel would help him get out of the penitentiary, and, if counsel would visit him, he would tell more about the murder; and later, in the presence of counsel for Hayes and officers at the penitentiary, he made a statement under oath to the effect that Hayes was innocent. His explanation was that Hayes had

promised to get him out of the penitentiary, or assist in doing so, if he would make this statement. He attempted to explain his other numerous conflicting statements. Evidently the jury believed his evidence on the witness stand as true and his other contradictory statements as untrue. Because of his contradictions and his dissolute life, his evidence may be regarded with grave suspicion. He was corroborated by evidence from reliable sources. As before observed, the credibility of and weight to be given to testimony of witnesses is peculiarly a jury function. It may be well to repeat the observations of JUDGE BRANNON in *State* v. *Bowyer*, 43 W. Va. 180, 27 S. E. 301, which are *appropos* here:

"It is not worth while to cite authority for the proposition that, where there is evidence tending to criminate, the jury is almost uncontrollably the judge of its force and weight, and of the proper inferences from the facts proven. But this was not all the evidence. The witnesses were face to face before the judge and jury. The prisoner was before them. They saw him in the ordeal of examination. They scrutinized his countenance, his demeanor, his words, his tone. They were to judge of his veracity. They discredited his denial of guilt. They saw and heard all the witnesses, all the circumstances of the trial,—often silent, but potential, evidence of the real truth. That judge and those jurors would average with us, had we been present, in capacity to judge of evidence; and as we have nothing of the actual appearance of the trial, and only the evidence in cold type, they are vastly more competent than we to pass safe judgment upon the facts. We are not a jury. We have power—mere power—to discredit verdicts; but we must be cautious in so doing.

"Why have juries if appellate judges are to go into the business of weighing evidence as if by the ounce and pound? We ought not to do this. It is an abuse of power, and a misconception of our functions and of the jury function. The jury institution is sacred under our constitution, and a verdict is to be highly respected. In long experience, I must say that, as a general thing, they evince good sense and do justice. From the frequency of requests to us to set aside verdicts, it seems to be thought that we can and will do so merely because we

would not have found, judging from type, the same verdict; but such is not the rule, though instances deviating from these principles may be found, and I am very much averse to looseness in this matter on the part of appellate courts. And then, too, we must not forget that a learned and experienced judge approved the verdict, after witnessing the trial; and his opinion is entitled to great respect in an appellate court. *State* v *Hunter,* 37 W. Va. 744, 17 S. E. 307. We must be careful lest we set ourselves up as judge and jury present at the trial, and usurp their functions.''

We cannot disturb the judgment on the assignment that the verdict is contrary to, and not warranted by, the evidence.

Error is assigned on refusal of the court to strike from the panel juror Fleshman. On examination of this juror upon his voir dire, counsel for the prisoner asked him if he did not have some prejudice against the prisoner who had previously been tried for the murder of one McLaughlin, and was answered that he (the juror) could not say he did have such prejudice. He answered another question that the things he had heard about the prisoner in connection with the McLaughlin murder might have created in his mind a fixed opinion against his reputation. But upon further examination showing that he could give the prisoner a fair and impartial trial, and that he would be governed solely by the evidence, he was accepted as a juror on the panel of twenty, but was not one of the twelve which rendered the verdict. There was no motion by the prisoner to strike this juror from the panel. He was not challenged. "The right of challenge, where it exists must be exercised before the jury is sworn, and if not so exercised, the objection is unavailing to set aside the verdict." *Hunter* v. *Matthews,* 12 Leigh (39 Va.) 228, 237. An objection to a venireman that he is not qualified according to law comes too late after he is sworn to try the issue. *Thompson* v. *Commonwealth,* 8 Grat. (49 Va.) 637; *Ohio River R. Co.* v *Blake,* 38 W. Va. 718, 18 S. E. 957. See *Poindexter* v. *Commonwealth,* 33 Grat. (74 Va.) 766, and footnote. After a juror has been sworn, the court may, in its discretion, allow the prisoner to challenge him for cause and strike him from the panel. *Tooel* v. *Commonwealth,* 11 Leigh (38 Va.) 714. See,

also, *State* v. *Howes,* 26 W. Va. 110; Code, c. 116, § 18.

Another ground of error is based on statements made in the arguments of the prosecuting attorney and special prosecutor. White, the prosecutor, said in argument: ''Ed Woodzell has been tried under that indictment, has been convicted by a jury of this county, and is now serving a life term in the penitentiary of this state, the evidence stands uncontradicted and there is no doubt but what Ed Woodzell was working for George W. George and that he quit work for George W. George the Friday before Snowden Crane was murdered.'' Osenton, the special prosecutor, said in argument: ''Let me tell you, Jim Hayes is a criminal, the criminal when he gets ready to rob his victim, fixes up an alibi and defense.'' Upon objection to this remark, the court told the jury not to consider statement of counsel with reference to the conviction of Ed Woodzell in arriving at the verdict, and ''you will not consider the opinions of counsel. You will pass on this case upon the evidence introduced before you.'' ''Counsel necessarily have great latitude in the argument of a case, and it is of course within the discretion of the court to restrain them; but with this discretion the appellate court will not interfere, unless it clearly appears from the record that the rights of the prisoner were prejudiced by such line of argument.'' *State* v. *Shores* 31 W. Va. 491, 501, 7 S. E. 413, 419, 13 Am. St. Rep. 875. The court promptly told the jury to disregard opinions of counsel and decide according to the evidence. We must accord some intelligence and discrimination to jurors. *State* v. *Shawn,* 40 W. Va. 1, 20 S. E. 873. We can see no prejudicial error under this assignment.

Another point of error is that the state was permitted to introduce evidence tending to prove that Ed Woodzell had been convicted of the murder of Crane; and this was prejudicial error, inasmuch as the conviction of Woodzell was not evidence of the guilt of the accused. 16 C. J. § 1341, p. 670. The indictment in this case was against Hayes alone. It appears from the record that Woodzell was in the penitentiary serving a life sentence for some crime. Witness Wallace, who was describing the condition of the body, its wounds, and how it was dressed, was asked if he had been a witness in the first

trial of Hayes and also in the ''Woodzell case.'' He replied that he had been. No objection was made to the question or answer. Witness Gladwell, who brought back Hayes on extradition and who testified that Hayes told him while coming back that he (Hayes) was at Fayetteville on the night of the murder (Hayes and his alibi witnesses said Hayes was at his home on that night), was asked upon cross-examination by defendant's counsel if he had not made a recent trip to Moundsville upon the request of the prosecuting attorney to talk to Ed Woodzell, and, upon answer that he had, further asked him if he did not go there in the hope of getting a statement in the case from Woodzell. Upon objection by the state he was not permitted to answer. On redirect examination the state asked him if he did have a talk with Woodzell at Moundsville and if Woodzell was the same man who had been convicted at the last term of court. Upon objection, he was permitted to answer, and his reply was in the affirmative. The defense opened the question of the witness' visit to Moundsville and its purpose, and we see no error in permitting the state to show that Woodzell was the same person who had been convicted of a crime in that court. If there was error, it was induced by the defense. Moreover, the court, at the instance of the defense, instructed the jury that the fact that Ed Woodzell had been convicted and sentenced should not be considered in the slightest degree in passing upon the guilt or innocence of the defendant, as a part of this assignment, it is argued that it was error to permit the state to trace the former ownership of the leather strap which was found around the ankle of the deceased. This strap was identified by Wm. Mansfield as one he had used on hames of harness owned by G. W. George. Mansfield had made a peculiar notch in the strap. It was also shown that Woodzell had worked for George a short time prior to the murder, and that after the murder the strap had disappeared from the hames and a rope used in place thereof. We can see no objection to tracing the ownership and identification of this rawhide strap. If an axe had been used in the murder and found on the scene, which belonged to a neighbor, it would be permissible to show the ownership of the axe, whoever might be accused of the crime.

But the objection is that the court permitted evidence showing that Woodzell worked for George prior to the crime, and the inference was that Woodzell had taken the strap to the scene of the murder. On that theory, the evidence would tend to corroborate Cody Allen of the prearrangement between himself, Hayes, Woodzell, and the man named ''George,'' as well as *substantiating his evidence of the manner in which the crime was committed.* It is generally held that evidence corroborating an accomplice's testimony must relate to some fact or circumstance material to the issue of the guilt or innocence of the accused; but, if the evidence tends to prove a material fact in issue, it is admissible in corroboration of the accomplice, although such fact does not of itself tend to connect defendant with the offense for which he is on trial. *State* v. *Maney,* 54 Conn. 178, 6 A. 401; *State* v. *Watson,* 31 Mo. 361, 366; *Ettinger* v. *Commonwealth,* 98 Pa. 338. See *Bruton* v. *State,* 21 Tex. 337, wherein it is said: ''In a case where corroborating evidence is required, it is always permissible to strengthen a witness' testimony by connected incidents showing its consistency and reasonableness.'' The credibility of Cody Allen was severely attacked by the defense, and this evidence tended to substantiate him. In *State* v. *Watson,* 31 Mo. 361, supra, an accomplice had stated that he had received money as the result of a robbery for which the defendant was being tried. A witness for the state was permitted to say that she had seen the accomplice with money shortly after the robbery. This evidence was objected to because it had no tendency to implicate defendant. The Supreme Court said in that connection: ''We do not understand that the State may not offer evidence corroborating the statements of the accomplice, although such corroboration may not go so far as to implicate the party on trial. Such evidence is undoubtedly competent if in other respects unobjectionable, and it is relevant upon the same principle that the demeanor of the accomplice himself on the stand and the intrinsic probabilities and consistency of his story would be in affecting his credibility before the jury.'' Evidence competent for any purpose is properly admitted over a general objection such as was here made. *Goodwin* v. *Coal Co.,* 88 W. Va. 49, 106 S. E. 76.

The objection to evidence showing that Woodzell and Hayes were seen together prior to and after the crime is without merit. Hayes said he had not seen or been with Woodzell prior to the murder. One witness said she saw Hayes and Woodzell talking on the road near Walker's store the second day after the murder, and heard Hayes say to Woodzell, "Keep that under your hat." She did not know what they were talking about, and the evidence was of little weight, but under all the circumstances was admissible for what it was worth. A garbled conversation between them while in jail, caught by a dictagraph, was of little weight, and nothing could be gathered intelligently from it, except that Hayes cautioned Woodzell "not to talk," and they would be exonerated.

A letter, written by Lottie Adkins to the prosecuting attorney in which she complained of treatment given her by the "Allens," then in jail, and stating that she knew "a plenty that will send them for life if it was looked into," and saying, if he needed her, call on her, and she would tell everything she knew about them, was tendered by the defense, and refused. The trial judge said he could see nothing therein affecting the guilt or innocence of Hayes. It was also shown that Lottie was then in jail and could have been easily produced as a witness for the defense. The letter was properly excluded from the jury.

A witness for the state, who lived about 300 yards from Crane's house, said some one on the Tuesday night before the murder shot at his dog and wounded it near, or in, his (witness') yard, and he thought he recognized the voices of Hayes and Walton, a first cousin of Hayes, the latter making reply to a request from one of the family to quit shooting. We cannot see wherein this evidence was relevant, except possibly to show that Hayes was there near Crane's house the night after the alleged conspiracy. He denied that he was there that night, and accounted for his presence elsewhere. It was not reversible error.

The last assignment is on the instructions given and refused. Thirteen instructions were given for the state; and thirteen for defendant, out of twenty offered. No serious objections

are offered against the state's instructions, and we perceive none.

Defendant's instruction 9, refused, would have told the jury that defendant was entitled to his presumption of innocence, and mere preponderance of evidence against him was not sufficient, unless it convinced the jury of his guilt beyond a reasonable doubt. The substance of this instruction was contained in defendant's instruction No. 1, given. Instructions should not be repeated. Instruction No. 12, refused, would have told the jury that it was their duty to acquit if they could reconcile the evidence on any reasonable hypothesis with defendant's innocence. The substance of this instruction was given in others; therefore no error to refuse it. Instruction No. 10, modified and given, was designed to tell the jury how to consider and weigh circumstantial evidence, if the state relied upon such evidence, in whole or in part; and the court gave it after striking out a clause therein to the effect that it was the sworn duty of the jury to consider circumstantial evidence with great care and caution. It is claimed that the modification was prejudicial. The rule is that, where circumstantial evidence is relied upon to establish the corpus delicti, or when relied upon to connect the accused with the crime, when the crime has been fully proven to the exclusion of all doubt, the circumstantial evidence should, to a moral certainty, exclude every other hypothesis except that of the guilt of the accused, and every circumstance essential in the chain in the same manner and to the whole extent as if the whole issue had rested upon that essential circumstance; and in such cases the circumstantial evidence relied upon must be scanned by jury and court with great caution. But this is not a case depending on circumstantial evidence. Here there was an eyewitness to the murder, supported by evidence that Hayes, on the night of the murder, inquired the way to Crane's house, and by threats or declarations made by defendant that he would stop Crane from telling lies. On these phases, the jury was elaborately instructed, and we fail to see wherein defendant was prejudiced by the failure to tell them to scan circumstantial evidence with great care and caution. See *Faulkner*

v. *Town of South Boston,* 139 Va. 569, 123 S. E. 358; *Crosby* v. *Commonwealth,* 132 Va. 518, 110 S. E. 270.

Defendant's instructions 13 and 20, refused, would have told the jury that, if they did not believe beyond a reasonable doubt that a conspiracy to rob or murder Crane had been formed between Allen, Hayes, Woodzell, and the man named "George" on November 21, 1927, or at any other time, then they should not consider any evidence relating to the acquaintance and associations of Woodzell and Cody Allen; the testimony relating to straps on Woodzell's saddle; or testimony in respect to the conduct, acts, and declarations between Cody and Woodzell at any time when defendant, Hayes, was not present. It is contended that No. 20 should have been given, both being practically the same. Where it is shown that a conspiracy has been formed, acts and declarations of the conspirators made in pursuance of the conspiracy are admissible against each conspirator; but, after the common enterprise is at an end, either by accomplishment or abandonment, such acts and declarations are not to be considered as against any of the other alleged conspirators. Wharton, Crim. Ev. (10th Ed.) § 699. But, if there has been no conspiracy, such acts and declarations cannot be considered for the purpose of establishing a conspiracy in the first place. The instruction here would have told the jury (in the event that they had reasonable doubt of the formation of the conspiracy) not to consider the acquaintance and associations of Cody and Woodzell, the leather strap on the latter's saddle, or any evidence with respect to the conduct, acts, and declarations between Woodzell and Cody when Hayes was not present. Even if there had been no previous common design between the alleged perpetrators to rob or murder Crane, the fact that they were all together at the commission of the murder would warrant evidence of previous acquaintance and association between themselves or any of them. The admissibility of the evidence pertaining to the strap found around the ankle of Crane has already been discussed. We find no acts or declarations between Cody and Woodzell, when Hayes was not present, testified to by any witness. They were seen together in the company of others several times prior to the murder, but no acts

or declarations made by either when they were together are testified to by any one. They were simply seen together in the company of others. Therefore there was no error in refusing the instruction. There was no evidence to support the latter part of the instruction, and it would have tended to confuse the jury.

The judgment will be affirmed.

*Affirmed.*