STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. AARON L. SIMON, IRVING SIMON, WILLIAM CONLON, CHARLES DECKER AND ALBERT DURGETT (IM-PLEADED WITH MICHAEL LA CONTI AND JOHN HICKLING), PLAINTIFFS IN ERROR.

Argued May 1, 1934—Decided October 5, 1934.

Before BROGAN, CHIEF JUSTICE, and Justices PARKER and BODINE.

For the plaintiffs in error, *Minturn & Weinberger*.

For the defendant in error, *James D. Carpenter, Jr.*, assistant attorney-general.

The opinion of the court was delivered by

PARKER, J. The plaintiffs in error were convicted on an indictment for conspiracy to commit embracery; and on these writs of error they attack the indictment as insufficient on its face; and also because of alleged misconduct in the grand jury room. A number of alleged errors in rulings on evidence are also argued, as well as the refusal of the trial court to direct an acquittal, both when the state rested and at the end of the whole case. Certain alleged errors in the charge are also set up.

The case is before us both on strict writ of error and on a certificate of the entire record of proceedings at the trial under section 136 of the Criminal Procedure act. There are three hundred and thirty-six assignments of error and three hundred and twenty-eight specifications of causes for reversal. Of these latter, three hundred and twenty-two are identical with the assignments of error. Specifications 323, 324 and 325 relate to certain rulings in the handling of the evidence, and specification 326 is that the verdict was against the weight of evidence. This last specification we deem to be wholly without merit, as we consider that the proof, as to weight and sufficiency, was ample.

Motion to quash the indictment was made before the trial court in due season as required by the Criminal Procedure

act, and a foundation thereby laid for attack on the indictment in the reviewing court in such particulars as were developed before the trial court. In the case of an indictment failing to charge a crime, our cases seem to hold that this review may be had even in the absence of a preliminary motion to quash. *State* v. *Pisaniello,* 88 *N. J. L.* 262. The point is not material at this time because motion to quash was made in due season. There were also motions later in the case to direct an acquittal on the same ground of insufficiency in the indictment, and also in arrest of judgment on the same ground, though this latter seems not to be argued at this time. In any event, the sufficiency of the indictment is fairly before us. It is rather too long to reproduce in full. It charges that on May 8th, 1933, at, &c., the seven defendants did willfully, &c., combine, unite, confederate, conspire, agree and bind themselves by agreement to commit (a) the crime of embracery; (b) and unlawfully to attempt to corrupt and influence a juror and jurors; (c) and to willfully and unlawfully corrupt and influence a juror and jurors; (d) to willfully incline such juror and jurors to be more favorable to the one side than to the other in a certain civil suit pending in this court for the county of Passaic; (e) and in a certain civil suit, &c., by willful and unlawful promises, &c., to obtain a verdict in favor of the plaintiff represented by the two Simons as counsel and attorneys; (f) and to attempt to instruct a juror and jurors beforehand outside of the court and not at the trial, and not by the strength of the evidence, arguments of counsel, and charge of the court in said suit; (g) and to hinder the lawful trial of said suit; (h) and to embrace and attempt to embrace and influence the minds of said jurors at the April term, 1933, of said court, to be more favorable to the plaintiff in a cause wherein Edward Veit was plaintiff and Fred L. Miller and William Werner were defendants. The indictment then goes on to relate certain overt acts alleged to have been committed in pursuance of the conspiracy. It requires nearly four pages of the printed case to detail these various acts and it is unnecessary to repeat them here. Doubtless this full recital was embodied in the indictment in view of our decisions that

overt acts must be averred therein. *State* v. *Norton,* 23 *N. J. L.* 33 (at *p.* 48); *State* v. *Barr,* 40 *Atl. Rep.* 772; *State* v. *Lustberg,* 11 *N. J. Mis. R.* 51, 54; 164 *Atl. Rep.* 703; *State* v. *Hemmindinger,* 100 *N. J. L.* 234; *affirmed,* 101 *Id.* 417.

In cases of conspiracy to commit murder, and several other crimes, where an overt act is by the statute unnecessary as an element in the conspiracy, none need be averred in the indictment. *State* v. *Sabato,* 91 *N. J. L.* 370.

Before taking up the argument upon the legal sufficiency of this indictment, it may be well to quote our statute relating to the crime of embracery, sections 16 and 17 of the Crimes act (*Comp. Stat., p.* 1748), which is carefully followed by the language of the indictment.

Section 16 reads:

"Embracery and all attempts to corrupt or influence a jury or any juror, or any way to incline such jury or any juror to be more favorable to the one side than to the other by promises, persuasions, entreaties, threats, letters, money, entertainments or other sinister means; all indirect, unfair and fraudulent practices, arts and contrivances to obtain a verdict, and all attempts to instruct a jury or juror before hand, at any place or time, or in any manner or way, except only in open court at the trial of the cause, by the strength of the evidence, the arguments of the parties or their counsel, or the opinion or charge of the court, shall be misdemeanors, and punished as are misdemeanors under this act."

Section 17 is as follows:

"Any juror who shall take money, goods, chattels or other reward of the one party or the other, or be as aforesaid embraced, shall be guilty of a misdemeanor, and punished accordingly; and be forever disqualified from acting as a juror in this state."

As to this latter section, the indictment avers that the defendants La Conti and Hickling, being jurors, received $50 apiece for joining in the corrupt verdict.

The somewhat extended argument that the indictment is insufficient on its face may be condensed into the two following propositions which we take from the brief of the plaintiffs in error:

I. That the crime of conspiracy to commit embracery by jurors does not exist in New Jersey, and that therefore the other named defendants (La Conti and Hickling) could under no circumstances be guilty of having conspired with the jurors to commit such a crime.

II. "If conspiracy requires an overt act, as does the crime of embracery, clearly the moment the overt act springs into existence we have the completed offense of embracery, and no opportunity exists, therefore, for the commission of the crime of conspiracy to commit embracery."

We are unable to see any merit in these propositions. As to the first: If A, an outsider, attempts improperly to influence B, a juror, to give a corrupt verdict, A is guilty of embracery whether or not the attempt be successful. If B, being so influenced, improperly influences juror C, it would seem that B is likewise guilty of embracery though both were jurors together. If A, an outsider, and B, a juror, influenced by A, agree to influence C improperly, A and B are guilty of conspiracy to commit embracery. So far as relates to La Conti and Hickling, it may fairly be said that they are by the indictment charged with violation of section 17, viz., receiving money for their votes and influence in the jury room. In any event, they both pleaded guilty to the indictment and are not before us at this time. So far as relates to their participation with the other defendants in a scheme to influence the rest of the jury, we are clear that the indictment expressly charges a conspiracy to that end as against the plaintiffs in error.

The second proposition seems to raise the question of merger of the conspiracy in the completed act. As to this it is sufficient to say that the doctrine of merger is discredited in this state as well as in this country generally. 1 *Bish. New Cr. L.* § 814; *Johnson* v. *State,* 29 *N. J. L.* 453; *State* v. *Preston* (Judge Dixon, in the Passaic Oyer and Terminer), 1 *N. J. L. J.* 117.

We conclude that the attacks on the face of the indictment are without substance.

The next main point is that the indictment should have been quashed because of certain extraneous matters alleged

by counsel for the first time when the case was moved, and of which there was no preliminary proof, viz.:

(a), (b) and (c) Because of the presence in the grand jury room of alleged unauthorized persons while testimony was being taken.

(d) Because the oaths to witnesses before the grand jury were not administered as required by law.

(e) Because the indictments resulted from bias, &c.

(f) Because the indictments were fraudulent and made for conspiracy through bias, &c., so as to increase the penalty.

(g) And that the court erred in denying plaintiffs in error the right to take testimony in support of the motion made on the foregoing grounds.

As to all but the last, the general rule is that the quashing *vel non* of an indictment is discretionary, and will not be reviewed either on strict writ of error (*State* v. *Dayton,* 23 *N. J. L.* 49, 57, 58), nor under section 136 of the Criminal Procedure act, because not occuring at the trial. *State* v. *Pisaniello, supra; State* v. *Riggs,* 92 *Id.* 575. As to the refusal of the court to take testimony in regard to matters orally alleged by counsel, there are two answers. The first is that whatever the testimony might have shown, the action of the court would still remain discretionary. The second is that the trial court was under no duty to suspend the trial, which had been moved after mature preparation, and go into an investigation, at that juncture, of the conduct of the grand jury, in the absence of anything by way of facts appearing on the record, or admission by the state, or sworn affidavit of the alleged irregularities. In short, there was no "verification of the motion." 31 *C. J.* 814. The rule is general, that one or more of the above classes of proof must be before the court. 42 *C. J.* 493; 19 *R. C. L.* 675; *Hodges* v. *Trenton Insurance Co.,* 24 *N. J. L.* 673. A mere offer to prove would not suffice. Counsel, as experienced practitioners, must have been aware of this rule. In fact, when after verdict, misconduct of the trial jury was alleged, affidavits were ready and were tendered.

We conclude that this second general point is not well taken.

III. The defendant La Conti, who had not been arraigned with the plaintiffs in error, pleaded guilty when the case was moved for trial; and the defendant Hickling, though represented by counsel, pleaded guilty immediately after motion to quash had been denied; and his counsel thereupon withdrew. The jury having been sworn, the assistant attorney-general (who for brevity, will be called the prosecutor), mentioned these two pleas of guilty in his opening. No objection was made at the time. The prosecutor proceeded, and about a minute later counsel for plaintiffs in error objected to any mention in the opening of transactions prior to May 8th, 1933. The court reserved ruling, subject to those transactions being "connected up;" and counsel excepted. As to the pleas of guilty, the present attack must fail because not founded on any timely objection at the trial. Moreover, the pleas were part of the record, and the jury were entitled to them like any of the public; and it was relevant to point out the reason of omitting from the trial two of those charged in the indictment. The matter was stirred later on a motion to declare a mistrial, counsel stating that he had not heard the offensive statement in the opening. But we are clear that the prosecutor was entitled to state to the jury the condition of the record. The argument is again advanced, that conspiracy to commit embracery is an unknown offense in this state. We think we have already said sufficient on that point.

IV. This point covers a number of assignments and specifications and is stated generally as follows in the brief:

"Because the court illegally admitted in evidence testimony of conversations as of April 29th and prior thereto wholly unrelated to the subject-matter charged in the indictment of an alleged conspiracy formed on May 8th, 1933;" and committed "error in refusing to strike out such testimony when so moved."

The underlying thought seems to be that because the conspiracy was alleged in the indictment as having formed on May 8th, any conversations or transactions between conspirators prior to that time are irrelevant and incompetent. It seems to be settled law, however, that it is not error to show prior conversations between co-conspirators looking toward

the formation of the conspiracy. 12 *C. J.* 634, 635; *State* v. *Lieberman,* 80 *N. J. L.* 506; *affirmed,* 82 *Id.* 748. The admission of such testimony appears to be to a certain extent discretionary with the court. It is strenuously argued that the court in any event erred in allowing a question to the defendant La Conti relating to his meeting with the defendant Irving Simon. La Conti had testified that he first met him in Paterson on April 29th and that it came about in this way: that the defendant Conlon came to his house about ten-thirty that morning. La Conti was then asked:

"Tell us what took place that morning which led up to your meeting Mr. Irving Simon?"

"Why, Conlon came to my home on the 29th to pay me the $100 on the Richmond case and after he paid me he said, 'come around the corner; I want you to see the boss.' I walked around the corner and in a car sat Irving Simon."

Counsel then moved to strike this out on the ground "that it relates to subject-matter not within the issue of the indictment." The trial judge said that if it were not connected up, he would strike it out, and the prosecutor assured him that it would be connected up. There is not much doubt that the part of the answer relating to the $100 to be paid on the Richmond case was incompetent, and that it would have been technical error to permit it to remain in the case over proper objection. But the question before us under section 136 of the statute is, whether the error was such as may have prejudiced the defendant in maintaining his defense upon the merits. We think it was not. The remainder of the answer we consider was entirely competent, and the remark of the witness was merely incidental to the fixing of the meeting with Irving Simon at the time when Conlon (not Simon) came to pay the witness the $100 on the "Richmond case," whatever that may have been.

The objections and motions to strike out were not based on any alleged injury done to Conlon, but one of them related to Aaron L. Simon and the other to Irving Simon, neither of whom was necessarily involved in the payment of the $100, which, so far as the case showed, had been paid by Conlon out of his own funds. On the whole, we think no harmful

error was here committed. It is not shown that there was any other testimony about the Richmond case or what that case was.

Point IV-A is essentially similar to point IV, and relates to testimony of the defendant Hickling, which is free of the troublesome feature just discussed. We think no further treatment of it is necessary.

Point V relates to admission of evidence of the flight of the defendants Conlon, Decker and Durgett. The present argument (based on certain rulings made by the late Mr. Justice Swayze sitting in the Hudson Oyer some years ago in a conspiracy case) is, that acts and declarations of an alleged conspirator after consummation of a conspiracy are not evidential against anyone, even himself, on the theory that such evidence necessarily reacts on the others; and that to allow the flight of one or more conspirators to be proved, amounts to proving an admission by those defendants of their guilt, which involves their co-defendants; and this although they have been returned to the jurisdiction and are on trial.

We find ourselves unable to subscribe to this proposition and cannot discover that it is laid down by the reported cases. Counsel cites 16 C. J. 661, and 8 R. C. L. 192, but the text of these authorities goes no further than to say that the subsequent act or declaration of one conspirator is not evidence against the others; and this is merely an application of the rule that whereas the acts and declarations of a conspirator while the conspiracy is in progress are evidential against all, that evidential character ceases after the consummation of the conspiracy.

In the English case of *Reg.* v. *Stenson*, 12 *Cox, C. C.* 111, 1117, it was said, "anything done at any time, even as late as the day before the trial, which shows that a person had been at a former time a party to a conspiracy, is admissible in evidence against such person." See 12 *C. J.* 636. The objection was made, in at least one instance, that the occurrence in question came into existence after the alleged consummation of the conspiracy and was not evidential against any defendant on trial. This point seems not well taken, as the defendant implicated was on trial. Throughout this line of

evidence, the court consistently ruled that the evidence touching the acts and declarations of any defendants after consummation of the alleged conspiracy should be considered only as regarded them, and that the court would instruct the jury to disregard it as to any other of the defendants. This ruling was correct.

Point VI. The same question arises in the charge, and the same point is made with regard to the instructions of the court in that regard. We think no further discussion of this phase of the case is required.·

Point VII relates to what may be called the episode of Miriam Damm and the dictaphone, which occurred after the alleged false verdict and the payment to the conspiring jurors. It relates more particularly to the defendant Irving Simon. The testimony indicated that Irving Simon had two rooms in a hotel and installed the recording part of a dictagraph in one of them, interviewing the defendant La Conti in the other room, where the receiving part was concealed. Miriam Damm was La Conti's sister, and testified to offers by Irving Simon of money for services in connection with arranging a meeting with La Conti. On cross-examination she was asked if she would recognize La Conti's voice on a victrola, and answered "according to how good the victrola is." At this juncture a man proceeded to adjust some instrument in presence of the court, counsel and witness; and the prosecutor objecting, counsel for defense said: "We propose to show what the conversation was that night as taken down on the record." The court overruled this, and properly, as Mrs. Damm was a state witness under cross-examination, and apart from other considerations, the time to contradict her testimony in any way, by whatever means, had not arrived. Later in the case, Irving Simon, a defendant, was sworn as a witness, and gave his version of the conversation with La Conti at the Riviera. He said the "dictagraph" was concealed under the mattress. Then he testified very fully to specific questions having been asked of La Conti at the Riviera interview, and the answers thereto. On cross-examination by counsel for Aaron L. Simon, a co-defendant, Irving Simon testified that dictagraph records were made at the time.

Counsel undertook to show that certain "records" which counsel exhibited were the records containing the alleged conversation. This was objected to and excluded. They had been marked for identification and at this juncture were offered in evidence, and excluded.

So far as relates to impeachment of the testimony of Miriam Damm, the "records" were clearly incompetent. It is elementary that prior inconsistent statements by a witness cannot be proved until the witness has been asked on cross, and has failed to admit, that he made them. Then the counter-proof must be by leading question, and answer, as to whether the witness, on the specified occasion, said what he had refused to admit saying. No machine could comply with that rule. A "demonstration" must inevitably have brought in the whole or a large part of the purported conversation, and probably have caused irreparable error.

The same may be said as to statements by La Conti at the Riviera interview. If he was cross-examined about anything he said then and there, the same rule of impeachment would apply.

Miriam Damm, as a witness to what others said at the Riviera interview, could be contradicted, and in fact was contradicted, by the testimony of Irving Simon, a living witness subject and subjected to cross-examination by the prosecutor, and who intimated on his cross-examination that the questions asked on direct were based on the phonograph "records."

We think those "records" were properly excluded as evidence of what was said at the Riviera interview. We know of no case and counsel cite none, in which a phonograph record of an alleged conversation was admitted in a court of law as evidence thereof. One good reason may be, that it cannot be cross-examined as to whether the whole conversation was reproduced. Such machines may be thrown in and out of gear at the will of the operator. Courts have gone so far as to permit the "character of sound" to be shown by phonograph, as for instance the roar of an elevated railway. 10 R. C. L. 931; 5 *Wigm. Ev.* § 795, note 5. But that is a very different affair.

Plaintiffs in error rely on the remarks of this court through the late Mr. Justice Kalisch in *State* v. *Dougherty,* 86 *N. J. L.* 525 (at *p.* 546), affirming a conviction which was later reversed by the Court of Errors and Appeals. 88 *Id.* 209. On page 546 it appears that a stenographer heard a conversation over a dictagraph, *i. e.,* "a telephone capable of reproducing sounds made at considerable distance from the transmitter and audible at corresponding distance from the receiver" (Standard Dictionary) and took down stenographic notes at the time and transcribed them on the typewriter, retaining a manifold copy. Then he was asked when sworn as a witness to the conversation, to produce his original stenographic notes, and stated that he could not find them but that his copy was a true transcription therefrom. Whereupon the court ruled that the witness might use this copy to refresh his recollection of what he heard over the dictaphone. Clearly, the "dictagraph" in that case was not a recording machine like a phonograph, but a concealed telephone transmitter which reproduced the sound in the next room by a receiver, and the stenographer took down what he heard as on a telephone. This was a very different matter from using a victrola or other phonographic machine as a witness. We are clear that the mechanical appliance produced in court was not properly qualified and that the court properly refused to allow it to be used.

The eighth point does not seem to be argued. It merely reproduces certain questions and answers in the examination of the witness La Conti, and says that the court erred in refusing to allow him to make answer. We are not advised wherein the court erred and feel it unnecessary to treat the point further.

Point IX relates to certain testimony of Jacob Schneider, who was attorney of record for the defendant Miller in the civil suit of Veit *v.* Miller et al., involved in the alleged conspiracy. It was in evidence that at the time of the defendant Conlon "retaining" La Conti and Hickling, there was an offer of $4,000 or $5,000 in settlement; and the prosecutor undertook to show by a question to Schneider that such an offer had been actually made. This was objected to as imma-

terial and incompetent. It is now further objected that this offer occurred before the 8th of May. As we have previously noted, that does not make the testimony incompetent. We think that what La Conti said could properly be considered by the jury as part of the conspiracy. He testified that $5,000 had been offered. It may not have been important to show, but we think that what was competent to show was that such an offer had actually been made. Its relevancy was to hold down the bribe to be paid La Conti and Hickling for bringing about a verdict.

The point also involves certain questions on cross-examination of Schneider. They were directed to the severity of the injuries to the plaintiff Veit and what Schneider had allegedly admitted on that point. The questions were excluded. As we view the matter, they were not evidential for any purpose except to show that the actual verdict found of $20,000 was a reasonable and proper verdict, and this seems to us wholly irrelevant. The questions themselves are printed in the brief under point X but the argument is made under point IX. What we have just said, therefore, covers both points.

Point XI is that the court committed prejudicial and harmful error in allowing the witness Agnes Walsh, as a rebuttal witness, to answer certain questions relating to an alleged conversation in her presence between the defendants Durgett and Irving Simon in regard to the case of State v. Cala, not involved in the present indictment. This rebuttal relates to the testimony of Irving Simon in his own behalf. He was called as his own witness and denied ever conspiring with Decker, Durgett or Conlon or his brother to commit the crime of embracery with regard to embracing any jurors in the Veit-Miller case. He was then cross-examined by Mr. Ward, counsel for Aaron L. Simon, and repeated the same answer in a slightly different form. On redirect his counsel asked him this question:

"Q. Mr. Simon, did you ever have any business dealings of any kind or nature with La Conti and Hickling personally? A. I did not. Q. Or through any other person such as Conlon, Decker or Durgett? A. I did not."

These questions on redirect were something like testimony of general good character. The counsel of Irving Simon at this juncture was undertaking to prove not merely that Irving Simon had never conspired with Conlon, Decker or Durgett in the Veit case, but had never conspired with them in any other case or had anything to do with them. The prosecutor then undertook to show on rebuttal that this testimony was false and that Simon had in fact been engaged in the manipulation of a jury in the two-year-old case of State *v.* Cala. It is argued for the plaintiffs in error that this introduced an immaterial issue; but the introduction of the immaterial issue was due entirely to the action of counsel for the defense, in undertaking to show the general virtue of his client. He was under no legal obligation to do this and, of course, would have been entitled to keep out testimony in chief with regard to the commission of other crimes. Moreover, even if the prosecutor had cross-examined Simon about the Cala case and Simon had denied having had anything to do with it, the prosecutor could not have then contradicted it. *State* v. *Mor,* 85 *N. J. L.* 558. But, as we have said, the issue was introduced by Simon himself. We find no error here.

Point XII relates to assignments and specifications Nos. 82, 83, 84 and 85, and specification No. 325. In order to elucidate the point, it will be necessary to give a short account of the phase of the trial to which it relates.

The defendant La Conti, who had pleaded guilty as we have seen above, was called for the state and in a direct examination covering something over more than twenty pages, related his talk with the defendant Conlon on April 29th. Conlon, according to his testimony, then shortly afterwards introduced him to Irving Simon. In the course of his testimony he said that he was foreman of the jury in the Veit case, and on May 8th, while in Passaic, he rang up Dr. Aaron L. Simon's office and spoke to him, recognizing his voice.

At the conclusion of his direct he testified that he had been arrested on the 15th of May, but not in connection with this case. He was then cross-examined by counsel for Aaron L. Simon, who asked whether he was not arrested for the present case as well as for the other, and answered in the negative.

He was then asked whether he did not attempt to extort money from a Dr. Ash who was engaged in litigation, and answered that in the negative. He also testified that thirty-six hours after he was arrested he made a statement in the Veit case implicating Dr. Simon. Later he was taken up for further direct by the prosecutor, who examined him on a point omitted in the original direct touching some transactions after the 8th of May. There was further cross by three of the counsel concerned for the defense, and finally on cross-examination by Mr. Raff, counsel for defendant Conlon, he was asked: "Q. Did you make—did you sign a statement for the police thirty-six hours after you were arrested?" (Objected to by prosecutor as immaterial and excluded, but not argued under the present point.)

The cross-examination proceeded, and finally counsel for the defendant Decker took it up and repeated the question in the following form: "Q. At the time you made a statement, Mr. La Conti, to the police, as you have already described it, thirty-six hours after you were arrested, was or was not that statement reduced to writing?" (Objected to, excluded and exception noted.)

Counsel then addressing the prosecutor said: "Mr. Carpenter, will you give me the first written statement made by Mr. La Conti thirty-six hours after his arrest?" Mr. Carpenter—"I cannot identify any such—wait a minute." The court—"Have we evidence here that a written statement was made, Mr. Carpenter?" Mr. Carpenter—"I don't think we have."

Mr. Selser then asked the court to direct Mr. Carpenter to produce it, and the court replied that there was no evidence before him that there was any written statement made, and therefore declined to direct its production.

Mr. Selser then asked the question: "Q. Did you or not make a written statement to the police approximately thirty-six hours after your arrest?" (Objected to by prosecutor as immaterial. Objection sustained and exception noted.)

Mr. Selser then asked the following question: "Is it not a fact that thirty-six hours after your arrest in a written statement made by you you said to the police that you made

a telephone call to Simon's office from the railroad station in the city of Paterson?" (Objected to as not the proper way to contradict the witness. Objection sustained and exception noted.)

These three questions are the basis of specifications 82, 83 and 84. The refusal to compel Mr. Carpenter to produce the statement is the basis of specification 325.

It should be said that during the colloquy Mr. Carpenter had intimated that if the defense wished to call for it and take the consequences, it would have to go into evidence, and he would get it from his office, a statement he (La Conti) made. The only rational theory on which the demand of counsel for an alleged written statement could be predicated was the wish to use it to impeach the testimony of the witness by showing that on another occasion he had made a statement, in writing, inconsistent with his testimony at the trial. It will have been observed that at no period of the cross-examination was there any intimation as to what the inconsistency was, until counsel asked the question whether thirty-six hours after his arrest he had said in a written statement that he made a telephone call to Simon's office from the railroad station in Paterson. This seems to present only a possible inconsistency, viz., that if the telephone call was the same call as that referred to in his testimony on direct, it had been made from the railroad station in Paterson instead of Passaic. But there was nothing in the testimony anywhere to indicate that it was the same telephone call or, indeed, made on the same date as that testified to on direct, particularly as no time was stated with respect to the making of the call.

With respect to the two questions asked as to whether the statement was reduced to writing, it should be a sufficient answer to say that the prosecutor substantially admitted that a written statement had been made, alhough the court held that there was no evidence of that fact. The existence of such statement being admitted, the next question was one of procedure, viz., how the defense could establish a right to have it produced? It may be conceded for the sake of argument, that defendants would have had the right to bring it into

court by subpœna; but this was not done. The rule seems to be that in order to lay the foundation for the impeachment of a witness by a written statement, the writing containing such statement must be produced and shown. 40 *Cyc.* 2732.

Assuming that a mere notice to produce would have sufficed, which we think is not the rule, proper practice necessarily requires that timely notice to produce it should have been given. 22 *C. J.* 960.

This paper clearly was not shown to have been in the possession of the prosecutor at the trial, and even if it had been so shown, we do not think that the prosecutor was bound to deliver it to opposing counsel, nor was the court required to compel him to do so. In *Watkins* v. *Pintard,* 1 *N. J. L.* 378, the witness under cross-examination admitted that he had a book account and that that book was in his possession in the court room, but that he spoke from memory in giving his testimony. Opposing counsel called for the book, which they insisted would prove something different from what was claimed, but the court would not compel the production of the book because no notice had been given to produce it; and this court held that no unfavorable inference could be legally drawn from its non-production.

This disposes of specification 325.

We conclude upon these four specifications that no legal error as been shown.

Specification 85 covers merely a repetition of the proposition that transactions prior to the actual formation of the conspiracy were irrelevant and should have been excluded. As to this nothing need be added to what has already been said.

Point XIII is that the court refused to direct an acquittal at the end of the state's case; and point XIV is a similar refusal at the end of the whole case. These two points are not argued in detail except by reference to the argument and brief relating to points I to XII. We see no merit in either of them. There was clearly a proper case for the jury at both stages of the case.

Point XV challenges three passages in the charge which taken by themselves read as follows:

"The defendants Michael La Conti and John Hickling have entered pleas of guilty to the charges of the indictment."

"What is the crime with which these defendants are charged? You will find it fully set forth in the indictment which you will take with you in the jury room for the purpose of perusal."

"The crime charged is conspiracy. The statute, in substance, reads that any two or more persons who shall combine, unite, confederate, conspire or bind themselves by oath, covenant, agreement or other alliance to commit any crime or to cheat and defraud, or to obtain money by false pretense, shall be guilty of a conspiracy."

We confess that we have considerable difficulty in understanding just what is the substance of the argument under this heading. As far as we can make out, it seems to be that the court in noting the pleas of guilty by La Conti and Hickling, intimated that because they had pleaded guilty, the jury ought to find the others guilty as well. Counsel quotes a passage in the charge to the effect that the acts and declarations of one conspirator in pursuance of the conspiracy are evidential against all until the conspiracy is consummated; and it seems to be claimed that the court in effect said that because they had pleaded guilty, their pleas of guilty were evidential against the others. However, we cannot find anything like this in the case and regard the point as nebulous, to say the least.

Point XVI. This challenges a passage of the charge in regard to the defendants Decker and Durgett, who were not sworn as witnesses. The court laid down the usual rule which obtains in a case where a defendant fails to take the stand in his own defense. The court charged that "when the accused is on trial and the evidence tends to establish facts which, if true, would be conclusive of his guilt of the charges against him, and he could disprove it by his own oath as a witness, if the fact be not true, then his silence would justify a strong inference that he could not deny the charges against him." The conclusion of the argument is as follows:

"The jury had a right to assume, when considering this instruction, that the act of Durgett and Decker in failing

to take the stand, was not alone presumptive evidence of guilt as against them, but could likewise be considered as evidence against the other plaintiffs in error that they were charged with the act and conduct of the two defendants who failed to take the stand." This is merely a repetition, in another form, of the fifth point.

We see no merit whatever in the argument.

Point XVII challenges the following passages of the charge:

"Now, ladies and gentlemen of the jury, if you are not satisfied beyond a reasonable doubt of the guilt of two or more of all of the defendants of the crime charged, it is your duty to acquit such person or persons so charged and return a verdict of 'not guilty.'

"If, on the other hand, you believe from the testimony, two or more or all of the defendants are guilty of the crime charged beyond a reasonable doubt, it is your duty to convict such persons as you believe to be guilty."

The argument is that La Conti and Hickling were out of the case in effect, and that it was erroneous of the court to tell the jury that, in order to find any of the defendants on trial guilty of conspiracy, they must find that two or more of them were guilty. It is argued: "The jury would have been perfectly justified and could have found but one guilty or could have acquitted all of the plaintiffs in error."

We cannot understand how this charge could have prejudiced any of the defendants on trial. If anything, it was more favorable to them than they were entitled to ask; for clearly if the state was under a burden of proving the guilt of at least two of the defendants then on trial, it would be a much greater burden than proving the guilt of one of them.

The foregoing answers all the points argued or briefed which relate to all of the defendants.

In regard to Aaron L. Simon, it is alleged (point XVIII) that the verdict was against the weight of evidence. We are clear that it was not.

Point XIX relates to the defendants Decker and Durgett, and is in effect that the proof as to them was so meager that the conviction ought not to have been sustained. We are satis-

fied that there was sufficient proof to take the case to the jury as regards each of them.

Point XX refers to the defendant Irving Simon and is much to the same effect, viz., that there was no evidence to indicate his guilt of the conspiracy charged in the indictment. We think there was ample evidence.

On the whole case our conclusion is that the judgment of conviction should be affirmed, as to each and all of the plaintiffs in error.