**TOWNSEND et al. v. UNITED STATES**
(two cases).

**FRIEDMAN v. UNITED STATES.**

Nos. 6847–6849, 6905.

Circuit Court of Appeals, Third Circuit.

Aug. 8, 1939.

Zeno Fritz and Frank J. Zappala, both of Pittsburgh, Pa., for appellants.

Charles F. Uhl, U. S. Atty., and John D. Ray, Asst. U. S. Atty., of Pittsburgh, Pa.

Before BIGGS, MARIS, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

The evidence in the two appeals sub judice reminds us of the famous description of the annual ball of the Mulligan Association. According to the well-known contemporary historian, M. R. Werner, a Tammany Judge at that fiesta "led through the happy mazes of the grand march a thousand pimps * * * and prostitutes, to the blatant crying of the band", McClure's Magazine, Vol. 33, p. 132; Werner, Tammany Hall, p. 501. We quote that phrase because the record discloses that the appellants do not cavil at the characterization. They concede, as we understand it, that three adjoining houses of prostitution were being operated in Alliance, Ohio in the winter of 1937. They a fortiori, so to speak, also admit that these institutions were furnished with the usual appurtenances, namely, madams and girls. One of the former is the defendant-appellant Elizabeth Townsend, alias Virginia Hines. Two of the latter are co-indictees who pleaded guilty and appear as witnesses in the cause. The category of pimps includes the defendant-appellant Friedman while defendant-appellant Martin is slated in the more specialized role of owner-operator and general handy man. Of the remaining co-indictees four pleaded guilty, five were found guilty and have not appealed.

The defendant-appellants shape their contentions to the particular charge, conspiracy to violate (and, except for Martin, violation of) the so-called Mann Act, 18 U.S.C.A. § 398. In other words, they direct their denials to "how the girls got there." Of this transportation or any part of it, they claim both ignorance and innocence. We are not going to perpetuate, even for the too little-read Federal Reporter, the sordid details that were spread before the trial judge and jury. Suffice it to say that they were convincing to both agencies of the criminal process (a motion for a directed verdict and a new trial were

denied, R. 96, 157, 158, T.R. 40, 44). We confine ourselves therefore to a consideration of the principal errors of law relied upon, dividing our discussion according to the particular appeals.

### Townsend and Martin

We are somewhat surprised at both sides' approach to the error at law here asserted. It lies in the introduction in evidence of the statements of the two prostitutes and co-indictees, Donaldson and Smith. These statements were made orally and in writing to one DiLillo of the F. B. I. and were both recited and produced by him, R. 24–32, 42–44. Appellants stress only the utterances of Smith because those of Donaldson are not damaging to them. The District Attorney with, as we think, more zeal than judgment, offered these statements as coming from co-conspirators. The only trouble with this position is that they are plainly not in furtherance of the conspiracy and are probably (being to a government agent) made after it had ended. This, the prosecution now concedes. It argues, however, with but meager resort to authority that the error was completely cured by the fact that Smith later took the stand and testified consistently with her extra-judicial statement. In reply, counsel for the defendant-appellants are content to cite us a case, Brady v. United States, 8 Cir., 39 F.2d 312, which contains no adequate discussion of the reason for the court's action, and involves besides a distinction in the rule for which he seems to be groping.

That rule has been long established and is supported by a multitude of authorities, all, we should have thought, easily available. They are to be found collected under the title "Witnesses" in the various aids to legal research, 70 C.J. § 1369, pp. 1183 et seq.; 30 Am. & Eng. Ency. of Law pp. 1145 et seq.; 43 Vale Pennsylvania Digest, Witnesses, West System ☞414(2), pp. 406 et seq. The heading is appropriate and is "prior consistent statements". Under it, we find numerous Federal cases in our opinion better reasoned than Brady v. United States above cited. The leading ones seem to be, Southern Pacific Co. v. Schuyler, 9 Cir., 135 F. 1015; Boykin v. United States, 5 Cir., 11 F.2d 484; Mansfield Hardwood Lumber Co. v. Horton, 8 Cir., 32 F. 2d 851; Dowdy v. United States, 4 Cir., 46 F.2d 417; Yoder v. United States, 10 Cir., 71 F.2d 85.

If a rule of evidence is well established it may serve only a pedantic purpose to indulge in any extended discussion of the logic behind it. We should rather have said that it used to serve only such a purpose. The legislative branch has, most wisely as we think, compelled the courts to adopt an attitude more consistent with the welfare of the general public and less tender towards the imaginary disadvantage of the accused. The policy prescribed for the Federal courts by the Act of February 26, 1919, Chapter 48, 40 Stat. 1181, is expressed in this language: " * * * On the hearing of any appeal, certiorari, writ of error, or motion for a new trial, in any case, civil or criminal, the court shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties." 28 U.S.C.A. § 391.

Behind this enactment lies an almost century old controversy over the principle that should govern the granting or denial of new trials for error in the admission or rejection of evidence. Under the orthodox rule at common law, such error was disregarded unless it appeared to the reviewing court that truth had not been reached in the trial below. Under the so-called Exchequer rule, on the other hand, any error that could have possibly affected the jury automatically required reversal, 1 Wigmore on Evidence, § 21. The orthodox and (we speak with vague surprise) liberal view has been almost universally accepted by legislators wherever the system of jury trial obtains. See Hebert, The Problem of Reversible Error in Louisiana, 6 Tulane Law Review 168, 169, note 7; 1 Wigmore on Evidence, § 21, above cited, note 17. The most famous statute is British, being Order 39, Rule 6 of the Supreme Court, promulgated in 1883 under the Judicature Act of 1875. It reads: "A new trial shall not be granted on the ground of misdirection or the improper admission or rejection of evidence * * * unless in the opinion of the court to which application is made some substantial wrong or miscarriage has been thereby occasioned in the trial." And its effect may be observed in the following cases: R. v. Peter Meyer, 1 Cr.App.R. 10; R. v. A. E. Dyson, 1 Cr.App.R. 13; R. v. Joseph Solomon, 2 Cr.App.R. 80; R. v. William J. Foy, 2 Cr.App.R. 121; R. v. Charles Cutting, 2 Cr.App.R. 151; R. v. Max Cohen and Leonard Nelson Bate-

man, 2 Cr.App.R. 197, 207; R. v. Thomas Kirkham, 2 Cr.App.R. 253, 255; R. v. Henry Beecham, 16 Cr.App.R. 26, 28; R. v. Wilcock, 16 Cr.App.R. 96, 102. The long and tedious legislative history of the Federal statute, 44 Reports of the American Bar Association 62, began with an unsuccessful attempt from 1909 to 1911 of the American Bar Association to persuade the Congress, and particularly the Judiciary Committees of the House and Senate, to adopt the English model. 33 Reports of the American Bar Association 542, 550; 34 Reports of the American Bar Association 578, 35 Reports of the American Bar Association 615, 620. The legislators, however, preferred the slightly less positive language which eventually became law, 36 Reports of the American Bar Association 448, 466. That language, we note, closely parallels section 640 of David Dudley Field's draft for a code of criminal procedure, proposed in 1849 and finally adopted by the New York Legislature in 1881 (New York Code of Criminal Procedure, section 542).

Students of criminal justice universally approve the old common law and new statutory rule. In fact, they criticize the courts for failing to live up to its spirit and purpose. Amidon, The Quest for Error and the Administration of Justice, 40 American Law Review 681; Sunderland, The Problem of Appellate Review, 5 Texas Law Review 126, 146–148; Wheeler, Procedural Reform in the Federal Courts, 66 University of Pennsylvania Law Review 1; Baldwin, The Artificiality of Our Law of Evidence, 21 Yale Law Journal 105, 113; Wigmore, Reversible Error, 19 Journal of American Judicature Society 28; 22 Michigan Law Review 591 (note). A recent writer has summed up this failure as follows: "The problem of prejudicial error is a problem in professional psychology. No rules can be framed which will solve it, for rules can only be drawn in general terms, and it is in the interpretation of the rules that the difficulty comes." Sunderland, The Problem of Appellate Review, above cited, at p. 146.

The rules of evidence embody the legal community's conception of the soundest method of eliciting that for which the judicial machinery is set up—the truth. As such, the failure to observe them imports a corresponding failure in elicitation. Obviously, these failures may be in varying degrees of gravity. As the legislative policy we have just considered commands us to emphasize gravity, we do so in this instance.

The prior consistent statement is, by hypothesis, improper as proof of the facts stated. By the same token, it may be admissible for the purpose of testimonial rehabilitation. The courts have differed on exactly when, first, that rehabilitation is necessary and, second, when the prior consistent statement does anything to accomplish it, 2 Wigmore 1128 et seq.; 70 C.J. 1369 et seq. They are all, however, agreed on such cases as impeachment by bias, interest or corruption, or to offset motive, recent fabrication, or contrivance, 2 Wigmore 1128, 1129, 70 C.J. 1369. In the case at bar a respectable argument for bringing the evidence objected to within the last named exceptions to the general rule might be made. We do not, however, rely on it but make our decision on the assumption that the Smith statement is offered in chief and before any impeachment of her.

Until the end of the Eighteenth Century, this sort of evidence was freely admitted, Sir John Freind's Trial, [1696] 13 Howell St.Tr. 32; Squires' Trial, [1753] 19 Howell St.Tr. 270. It was thought that the only objection was the hearsay rule and that it came under some sort of exception thereto. Gilbert, Evidence 68, 150. Professor Wigmore points out the fallacy of any application of the hearsay rule, 2 Wigmore on Evidence 1131, 1192. The learned Professor goes on, however, to indicate the logical objection to its indiscriminate admission in chief and before any impeachment. We quote: "When the witness has merely testified on direct examination, without any impeachment, proof of consistent statements is unnecessary and valueless. The witness is not helped by it; for, even if it is an improbable or untrustworthy story, it is not made more probable or more trustworthy by any number of repetitions of it. Such evidence would be both irrelevant and cumbersome to the trial; and is rejected in all Courts." 2 Wigmore on Evidence, above cited, § 1124. To put it another way and in our own language, prior consistency is in the field of credibility the same lifting by the bootstraps that one often sees in the field of credit. We think, however, that a thoughtful application of the above passage to the circumstances of the case at bar demonstrates the entire lack of that gravity and error of which we have spoken.

Testimony may be irrelevant because it has no bearing on the case at bar. No one would contend that the admission of improper evidence of let us say the clearing house number of February 19, 1937, to be reversible error. The statements criticized are here irrelevant, as a matter of human behavior (a liar will keep on lying—cf. the falsus in uno maxim). If the triers of the fact are analysts of the caliber of Professor Wigmore, they will realize this canon of conduct and the effect of the prior consistent statement will be nil. Assuming that they are not such analysts there may remain a residuum of (wrong) emphasis. To permit that possible emphasis to upset convictions might require similar reversals for any misreception of cumulative evidence. Courts and their controlling parliaments have sometimes prescribed such evidence in cases of a peculiar temptation to falsehood, cf. wills, rape, accomplices, etc. We do not believe they either will or should reverse the principle and proscribe because of it. It is true the accumulation here reenforces the same witness; on the other hand, that same witness is offered for thorough cross-examination with its consequent testing of her trustworthiness. The New York Court of Appeals, interpreting a cognate statute to our own in a murder case, said: "Our consideration, however, is not terminated in a reversal of the judgment because error was committed by the trial court. The direction of the Legislature to us in criminal cases is to 'give judgment, without regard to technical errors or defects or to exceptions which do not affect the substantial rights of the parties.' Code of Criminal Procedure, § 542. This court is loyal to such direction and frequently applies it. We do not reverse a judgment for errors at the trial which did not prejudicially affect the rights of the defendant. * * * The declaration of the deceased in the doorway that the appellant shot him added nothing to the facts presented. The dying declaration stated, under conditions more impressive, the same act on the part of the appellant. The effect held by the minds of the jurors at the close of the evidence would have been the same had the declaration in the doorway not been made. It follows that its erroneous admission in evidence must be disregarded by us." People v. Sprague, 217 N.Y. 373, 111 N.E. 1077, 1079, 1080.

We think that here also the effect upon the minds of the jurors would have been the same if Smith's declaration to DiLillo had not been made. Her declarations in court had that most impressive of all sanctions, the subjection to cross-examination. We conclude, therefore, that the error here is technical and does not affect the substantial right of the parties. We do so without resorting to any doctrine of other evidence or overwhelming guilt. Taylor v. United States, 8 Cir., 19 F.2d 813; Garcia v. United States, 1 Cir., 10 F.2d 355; Marron v. United States, 9 Cir., 18 F.2d 218, certiorari granted 274 U.S. 727, 47 S.Ct. 574, 71 L.Ed. 1313; Williams v. United States, 8 Cir., 265 F. 625, prosecuted under the Mann Act; Bruno v. United States, 9 Cir., 67 F.2d 416; Hartzell v. United States, 8 Cir., 72 F.2d 569, although as we hinted, we might easily have done so.

### Friedman

The evidence against this appellant plumbed the depths of human degradation. He is the husband of one of the prostitutes, Marion Friedman, who for some reason not apparent in the record, has not been indicted. It was stated and not denied that both before and after marrying her he had "lived off" her earnings. Without contradiction also, it appeared that one of the madams, Margaret Bolton, alias Ross, from Alliance, Ohio, visited her in February 1937, in the company of a fellow pimp of her husband's (one Davis, indicted, convicted and not appealing) and urged her to come to Alliance to "work". Further, toward the end of that month, she and Davis telephoned to the said madam and advised her they were coming down from Pittsburgh by automobile. Again further, that Marion Friedman did go down to Alliance with Davis and her husband in Davis' automobile and did spend two nights at madam Ross'.

It is upon the parties arrival there that the roads of evidence fork. The defendant-appellant contends that his self-willed wife overcame him, and we suppose his "professional" friend, Davis, and insisted on paying an innocent week-end visit to her "old pal" Margaret. The witness wife contends both ways. At the trial she, too, stressed both her independence and her innocence. The extent of her entry upon the "primrose path" was, she said, only convivial inebriation, the drinks being paid for by her companions at a rate in excess of the ordinary retail price.

This account of her proceedings so astonished the United States Attorney that

he asked for and received from the court the privilege of cross-examining his own witness. The cause of his not unwarranted surprise was the possession of a statement made by Marion Friedman to the same F. B. I. agent, DiLillo, who received the admissions of the prostitutes in the Townsend-Martin case. This statement was of the same sordid tenor and effect as the statement and testimony of the other prostitutes, each one, of course, describing only her own lewd actions. In that connection, we also must plead surprise at counsel's apparent theory that unbiased witnesses to acts of prostitution are generally available.

Marion Friedman's explanation of these contradictions was, we thought, pitiful, and we use that word in its sympathetic and not its derogatory sense. It consisted of an alleged and now forgotten grudge against her husband (God save the mark) and of the absorption of numerous "shots of liquor". We disregard her statement that she had taken poison because it finally appeared that this occurred after her appearance before the United States Commissioner and her interview with DiLillo. The jury believed her unsworn statements and not her testimony in court. Although theirs is the function, we may say, so do we. We have made this unpleasant factual recital in support of our own belief and in contradiction of appellant's argument that the jury should not have been allowed to express their belief.

We have spoken of our feeling of the defendant-appellant's degraded, as shown by this record, character. We need hardly say that before the bar of justice even the most degraded ranks with the most exalted. If accordingly, Isadore Friedman, has had his "substantial rights affected" he is under the statute above cited entitled to a reversal. The only other point pressed upon us, is the supposed failure of the judge to include in his charge what we might almost refer to as the "standard caution" in re prior inconsistent statements. 2 Wigmore on Evidence § 2018. The learned trial judge's actual words are to be found on pages 119–120 of the Record: " * * * and that in spite of the fact that the Government had a statement from her that she did go to Alliance, Ohio for the purpose of practicing prostitution. Now, that statement *is not evidence,* but we permitted the United States Attorney to cross examine the witness Marion Friedman for the purpose of seeking to get from this witness, if possible, the whole truth of the matter." (Italics Ours). The only difference between them and the appellant's point for charge, Record 41, is in their omission of the word "substantial". We think that omission favors appellant. As the greater includes the lesser, he can scarcely complain of this omission of the qualification.

We do not understand the United States Attorney's citation to us of United States v. Block, 2 Cir., 88 F.2d 618. As it requires distinguishing, it could hardly help him. The distinction happens to be plain. In the principal case, the statement was not objected to, Record printed in Government's brief p. 170. Nor were the jury told that they "might use any part of the statement which the witness had admitted", United States v. Block, 2 Cir., 88 F.2d at page 619, above cited. Accordingly, here also it is unnecessary to rely upon overwhelming guilt or other evidence etc.

The judgments are affirmed.