## UNITED STATES v. PERLSTEIN et al.
### Nos. 7507, 7527.

Circuit Court of Appeals, Third Circuit.
April 24, 1941.

CLARK, Circuit Judge, dissenting.

278

Paul M. Salsburg, of Atlantic City, N. J., for appellant Benjamin M. Perlstein. Harry Paul, of Atlantic City, N. J., pro se.

Joseph W. Burns, of Washington, D. C., for appellee.

Before MARIS, CLARK, and JONES, Circuit Judges.

MARIS, Circuit Judge.

In an indictment containing two counts Benjamin M. Perlstein and Harry Paul were charged jointly with Herbert R. Short and Michael Aluise in the District Court for the District of New Jersey with conspiracy to violate certain laws of the United States. The first count charged that from October 15, 1937, to April 16, 1940, all four defendants conspired to influence, intimidate and impede witnesses and to obstruct the due administration of justice in the District Court for the District of New Jersey and the grand jury thereof in violation of Section 135 of the Criminal Code, 18 U.S.C.A. § 241. The second count charged that from April 1, 1937, to April 16, 1940, all four defendants conspired to have in their possession an unregistered still, to carry on the business of a distiller without having given bond and to make and ferment mash fit for distillation in a distillery not duly authorized, in violation of the internal revenue laws, 26 U.S.C.A. Int.Rev.Code, §§ 2810, 2814 and 2819. At the close of the government's case the court directed a verdict on the second count of the indictment in favor of the defendant Paul. The jury found Short and Aluise guilty on both counts, Perlstein and Paul guilty on the first count and Perlstein not guilty on the second count. These appeals are by Perlstein and Paul.

### Continuance

■ The defendants allege that the court erred in refusing to grant a continuance. The indictment was filed April 16, 1940. Paul retained counsel May 6, 1940, and Perlstein consulted his counsel at an earlier date. Counsel received notice of trial June 3, 1940. They appeared in court on June 4th and were informed that the case would be tried in Camden on June 10th. Their application that the case be tried at a later date was denied. On June 10th they renewed their application for a continuance, assigning two grounds. The first was that they had not been given sufficient time to confer with each other and to prepare for trial. The answer to this contention is that the defendants knew of the charge for almost two months before trial and their counsel for at least a month before trial. This clearly was sufficient time under ordinary circumstances to prepare for trial. The fact that the defendants' counsel were almost continuously engaged in the trial and preparation of other cases during this period was a fact to be considered by the court in the exercise of its discretion but obviously was not necessarily a deciding factor. Otherwise the trial of criminal cases would have to be indefinitely postponed to suit the convenience of attorneys when the demand for their services exceeds the time at their disposal. Expedition in disposing of criminal cases is of the utmost importance, not only to the government but also to the accused. Postponements are not to be favored unless they are necessary to afford the accused a reasonable opportunity for the preparation of his defense. We think the present case presents no such circumstances of undue haste as would make the refusal of a continuance an abuse of discretion and that decisions such as Cooke v. United States, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767; Franklin v. South Carolina, 218 U.S. 161, 30 S.Ct. 640, 54 L.Ed. 980; Rogers v. Peck, 199 U.S. 425, 26 S.Ct. 87, 50 L.Ed. 256; Hooker v. Los Angeles, 188 U.S. 314, 23 S. Ct. 395, 47 L.Ed. 487, 63 L.R.A. 471; Louisville & Nashville R. Co. v. Schmidt, 177 U.S. 230, 20 S.Ct. 620, 44 L.Ed. 747, and Roller v. Holly, 176 U.S. 398, 20 S.Ct. 410, 44 L.Ed. 520, cited by the defendants, are inapplicable.

■ The second ground relied upon for the continuance is that two witnesses, whose testimony is alleged to be of the greatest importance to Paul's defense, had left the jurisdiction May 27, 1940, were in California and would not return to New Jersey until September 29, 1940. Although the testimony of the absent witnesses is alleged to be vital to Paul's defense he made no request for the issuance of a subpoena to run to California, as authorized by Sec. 876, Rev.Stats., 28 U.S.C.A. § 654. It is significant that neither Paul nor his co-defendants mentioned these witnesses in their testimony, nor was any effort made upon cross-examination to elicit any information about them. Under the circumstances described we do not find that the court abused its discretion in refusing the continuance. Isaacs v. United States, 159 U.S. 487, 16 S.Ct. 51, 40 L.Ed. 229.

## Motions to Quash the Indictment

The grand jury which returned the indictment was empanelled for the term of the District Court which commenced at Camden on the first Tuesday in December, 1939. The term ended on January 16, 1940, when a new term of the court began at Trenton. Sec. 96 Judicial Code, as amended, 28 U.S.C.A. § 176. By an order dated January 11, 1940, a District Judge continued the grand jury in office after the expiration of the term to enable it to complete all unfinished business. This action was taken pursuant to the authority of Sec. 284 of the Judicial Code, as amended, 28 U.S.C.A. § 421, the material part of which is set out in a footnote.[1] The grand jury found the indictment against the defendants on April 16, 1940. These facts appear in the record. The date when the grand jury began its investigation as to these defendants does not appear in the record. Before the trial began the defendants, with leave of court, withdrew their pleas of not guilty and each orally moved to quash the indictment on the ground that the grand jury was without power to find it. They alleged that the indictment was defective because it did not show that the grand jury's investigation was begun before the extension and they offered to prove that it was in fact begun after the extension of the grand jury's term of service in direct violation of the Act of Congress. The government contended that the defendants' objections could not be raised by motions to quash, and that, even if they could be, the motions should have been verified. The court denied the motions to quash and the requests for leave to offer testimony to substantiate the allegations of the motions. The denial of these motions is assigned as error.

 The practice in criminal cases in the District Court for the District of New Jersey is determined by the law of New Jersey as it existed at the time of the passage of the Judiciary Act in 1789, unless later changed or modified by acts of Congress or by the decisions of the federal courts. United States v. Reid, 53 U.S. 361, 12 How. 361, 13 L.Ed. 1023; United States v. Murdock, 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210, 82 A.L.R. 1376. At common law in New Jersey indictments which were defective for errors extrinsic to the record might be attacked by motion to quash. State v. Nicholls, 5 N.J.L. 621; State v. Rickey, 9 N.J.L. 293. The same procedure has been followed in many federal courts.[2] Accordingly it cannot be said that motions to quash were improper to raise the question of the grand jury having exceeded its powers in this case.

 There is, however, another objection to the motions to quash which were made in the present case. The court was called upon by the motions to determine factual matters not before it in the record and to enter into a trial of facts which had no bearing upon the guilt or innocence of the accused. Something more than a bare allegation by the accused is required to justify a court in permitting itself to be thus diverted from the merits of the accusation. The existence of valid grounds for quashing the indictment must be clearly shown. Accordingly it is held at common law in New Jersey as well as in the federal courts that a motion to quash must be verified, either by facts of record, by admissions of the government, or by affidavits as to the alleged irregularities. State v. Simon, 113 N.J.L. 521, 174 A. 867; United States v. Coolidge, Fed.Cas. No. 14,858; Colbeck v. United States, 7 Cir., 10 F.2d 401; Kastel v. United States, 2 Cir., 23 F.2d 156; United States v. Reilly, D.C., 30 F.2d 866. The defendants in the present case wholly failed to comply with this requisite. They made their motions to the trial judge orally and suggested that they could call the district attorney to testify as to the date when the investigation was begun by the grand jury. There was absolutely no basis laid in support of the allegation that the inves-

[1] Sec. 284. " * * * A district judge may, upon request of the district attorney or of the grand jury or on his own motion, by order authorize any grand jury to continue to sit during the term succeeding the term at which such request is made, solely to finish investigations begun but not finished by such grand jury, but no grand jury shall be permitted to sit in all during more than eighteen months: Provided, That, for good cause shown, the court may, at any time after the end of the term for which the grand jury was originally summoned, excuse any member of the grand jury and summon and impanel another person in his place. * * * "

[2] Mamaux v. United States, 6 Cir., 264 F. 816; May v. United States, 8 Cir., 236 F. 495; Chadwick v. United States, 6 Cir., 141 F. 225; United States v. Antz, C.C., 16 F. 119; United States v. Rosenthal, C.C., 121 F. 862; United States v. Heinze, C.C., 177 F. 770.

tigation was begun after the extension of the grand jury's term. The offer to cross-examine the district attorney indicated merely that the defendants desired to engage upon a fishing expedition. There were presented to the court in support of the motions neither record facts, admissions by the government nor affidavits by persons acquainted with the facts. Because of this lack of verification the motions to quash were properly denied.

*Election of Counts*

Before trial the defendants filed a motion to compel the government to elect upon which count it would proceed, alleging that the counts were improperly joined in the indictment. This motion was refused. After the government's opening to the jury the defendants renewed their motion, which was again refused. At the close of the government's case the same issue was indirectly raised by motions to dismiss and to direct verdicts for all four defendants. The trial judge granted the motion to direct a verdict on the second count as to the defendant Paul and refused the other motions. The refusal of the trial judge to compel the government to elect the count upon which it would proceed is assigned as error.

The government relies upon Sec. 1024 Rev.Stats., 18 U.S.C.A. § 557, for the right to join the offenses in one indictment. That section provides: "When there are several charges against any person for the same act or transaction, or for two or more acts or transactions connected together, or for two or more acts or transactions of the same class of crimes or offenses, which may be properly joined, instead of having several indictments the whole may be joined in one indictment in separate counts; and if two or more indictments are found in such cases, the court may order them to be consolidated."

The government claims that the acts or transactions alleged in the two counts were connected together and that they were of the same class of crimes or offenses. and might be properly joined. It is clear that the counts did charge two offenses "of the same class," for in each instance what was charged was not the substantive offense but the conspiracy to commit it. The gist of any conspiracy charge is not the objective of the conspiracy but the unlawful agreement or combination. Each of the conspiracies charged in the present indictment was made an offense by the same federal statute (Section 37 of the Criminal Code [18 U.S.C.A. § 88] ) and is subject to the same punishment. However, even though the offenses charged are of the same class, the right to join them in one indictment is further restricted by the statute, which provides that the right exists only if they "may properly be joined". The propriety of such joinder must be determined under "the settled principles of criminal law." Pointer v. United States, 151 U.S. 396, 400, 14 S.Ct. 410, 411, 38 L.Ed. 208. We accordingly turn to the consideration of those principles.

In Chitty's Criminal Law, 1819 Ed., Vol. 1, Secs. 249, 253 it is said (Sec. 249) " * * it is even no objection, either upon demurrer, or upon arrest of judgment, that separate offences of the same nature are joined against the same defendant * *. And the only mode of objecting to a joinder of such offences in case of felony, is by an application to the court to quash the indictment before plea, or to compel the prosecutor to elect, which charge he will try in a subsequent stage of the proceedings. But the court will only listen to such a request, when they see that the charges are actually distinct, and may confound the prisoner, or distract the attention of the jury." (Sec. 253) "In cases of felony, no more than one distinct offence or criminal transaction at one time, should regularly be charged upon the prisoner in one indictment; because, if that should be shown to the court before plea, they will quash the indictment lest it should confound the prisoner in his defence, or prejudice him in his challenge to the jury; for he might object to a juryman's trying one of the charges, though he might have no reason so to do in the other; and if they do not discover it until afterwards, they may compel the prosecutor to elect on which charge he will proceed. But this is only matter of prudence and discretion which it rests with the judges to exercise. For, in point of law, there is no objection to the insertion of several distinct felonies of the same degree, though committed at different times, in the same indictment against the same offender; and it is no ground either of demurrer or arrest of judgment."

The objection to joinder, if it is not prohibited by statute, is that the multiplicity of charges tends "to confound the accused in his defense, or to prejudice him as to his challenges, in the matter of being held out to be habitually criminal, in the

distraction of the attention of the jury or otherwise, * * *." McElroy v. United States, 164 U.S. 76, 80, 17 S.Ct. 31, 32, 41 L.Ed. 355. In Pointer v. United States, supra, the defendant was charged in an indictment containing four counts with the murder of two persons on the same day, in the same place and with the same kind of instrument. The Supreme Court held that under the circumstances proved by the government it was not error for the trial court to refuse to compel the government to elect upon which count it intended to prosecute. In McNeil v. United States, 66 App.D.C. 199, 85 F.2d 698, the joinder of a count charging three persons with conspiracy to commit grand larceny with a count charging the same three persons with conspiracy to cause one of the three to commit the crime of embezzlement was not improper. The court said (85 F.2d at page 703): "While it is true the charges are separate offenses, they are directly connected together, and it is obvious that the evidence offered to sustain one count was properly admissible and relevant to sustain the other." In United States v. Lotsch, 2 Cir., 102 F.2d 35, the indictment charged in three counts the receipt upon three separate occasions of commissions from borrowers by the defendant while an officer of a national bank. The court found nothing improper in the joinder, the test being (102 F.2d at page 36) "if the defendant can be fairly tried on all the charges at once."

■■ It thus appears that action upon an alleged misjoinder of counts in an indictment is a matter of discretion with the court and that if in the opinion of the court the jury will not be confused by the multiplicity of charges and the defendant will not be embarrassed in his defense the court may refuse to direct an election by the government. It is, as this court pointed out in United States v. Silverman, 3 Cir., 106 F.2d 750, a choice between the economy of a single trial of issues which are closely related, on the one hand, and the safeguarding of the defendant from the possibility of prejudice arising from the multiple charges, on the other hand.

■■ The indictment in the case before us alleges that the conspiracy to obstruct the due administration of justice was not formed until October 15, 1937, two days after the conspiracy to operate the stills ceased with their seizure. Consequently the two conspiracies occupied distinct periods of time which did not overlap. The

evidence as to the conspiracy to obstruct the due administration of justice was clearly irrelevant to the question as to the existence of the earlier conspiracy to operate the stills. Accordingly, the court might well have held that the joinder was improper for that reason. That point has now lost its force, however, in view of the fact that the jury were evidently not confused since they acquitted Perlstein of the conspiracy to operate the stills while convicting him of the later conspiracy to obstruct the due administration of justice.

It is urged, however, that the evidence as to the conspiracy to operate the stills was not relevant with respect to the conspiracy to obstruct the due administration of justice, of which latter conspiracy the defendants were convicted. After careful examination of the record we are satisfied that this evidence did have a bearing upon the latter issue. The government sought to show that the activities of Perlstein and Paul were directed toward protecting Short and Aluise from prosecution by inducing other parties involved not to identify them or connect them with the still enterprise. In appraising this evidence it was helpful for the jury to know something of the details of the still enterprise itself and of the relationship not only of Short and Aluise but of the other witnesses to it. It follows that the court did not abuse its discretion in requiring the count charging the conspiracy to obstruct the due administration of justice to be tried with the count charging the conspiracy to operate the stills.

*Rulings on Evidence*

■■ The federal investigation of the crimes here involved began November 1, 1939. That was the earliest date upon which it could be said that there were any proceedings under way involving the administration of justice in the federal courts. The defendants contend that there could not have been a conspiracy to obstruct the due administration of justice at any time before that date and that consequently evidence as to any events which took place prior to that date was inadmissible. They rely upon Pettibone v. United States, 148 U.S. 197, 13 S.Ct. 542, 37 L.Ed. 419, as ruling that there can be no conspiracy to obstruct the due administration of justice in the federal courts unless there are proceedings pending in the federal courts at the time of the alleged conspiracy. Pettibone v. United States arose out of a labor dispute. It was alleged in the indictment

that in May, 1892, a mining company brought an equity suit against a union and many named individuals as defendants in the United States Circuit Court for the District of Idaho and procured a decree enjoining the defendants from interfering with the company or intimidating its employees or prospective employees. It was further alleged that in July, 1892 while the injunction was in full force the defendants named in the indictment (not those enjoined in the equity suit) conspired to compel the employees of the company to abandon their work and to intimidate officers and agents of the company into discharging all non-union employees. The indictment concluded that the defendants were therefore guilty of obstructing the due administration of justice in the United States Circuit Court for the District of Idaho. There were no averments that the defendants knew of the injunction or that the purpose of the conspiracy was to violate the injunction or to interfere with the proceedings in the United States Circuit Court. The Supreme Court held that the indictment was fatally defective because of the failure to allege knowledge on the part of the defendants. The effect of the court's holding was that the concerted actions of the defendants resulting in violation of the injunction could not be a criminal conspiracy to obstruct the due administration of justice unless the defendants by reason of their knowledge of the existence of the injunction decree were in a position to realize that their acts, otherwise lawful, would tend to obstruct the due administration of justice. Without that knowledge there could have been no criminal intent. The present case involves the administration of criminal justice and therefore presents a totally different situation. Every person who commits a criminal offense is bound to know that if his crime is detected prosecution will follow. If, therefore, he and others agree upon action calculated to enable him to prevent, evade or escape such prosecution and overt acts follow they thereby make themselves guilty of a criminal conspiracy to obstruct the due administration of justice, even though either because of their machinations or for some other reason the prosecution is delayed or never actually results. If we were to hold otherwise we would put a premium upon the success of such a conspiracy in preventing prosecution until after the statute of limitations has run. We do not think that the decision in Pettibone v. United States was intended to support such a proposition.

John H. Dilks, a government witness, was permitted to testify over objection to two conversations between himself and John A. Graham, which took place in the presence of defendants Short and Aluise. Perlstein and Paul were not present at either time. Counsel for Perlstein and Paul requested that the court instruct the jury that as to them the testimony had no force. This request was refused. Dilks testified that Graham said to him "These fellows [Short and Aluise] were sent out by Nuck [Enoch L. Johnson, the county treasurer and political leader] to get a place to put a pot [still]", that he said, "How do we know that Nucky sent them out? Anybody could come out and tell us Nuck sent them out. I am going to find out more about it"; that Short and Aluise answered "Well, you don't think we would be out here unless we were sent." Dilks testified that he then visited Enoch L. Johnson's office, spoke to Johnson's secretary, and returned to report to Graham the answer he received from her. His testimony was that on this occasion he said "I told them that Nucky wanted these fellows taken care of. Their attorney, Perlstein, had been just in there." The testimony was introduced over the objection of Perlstein and Paul, who now assign the trial court's action as error.

In Wigmore on Evidence, Third Edition, § 1766, the author states: "The theory of the Hearsay rule is that, when a human utterance is offered as evidence of the truth of the fact asserted in it, the credit of the assertor becomes the basis of our inference, and therefore the assertion can be received only when made upon the stand, subject to the test of cross-examination. If, therefore, an extra judicial utterance is offered, not as an assertion to evidence the matter asserted, but *without reference to the truth of the matter asserted,* the Hearsay rule does not apply. The utterance is then merely not obnoxious to that rule." It was evidently this distinction which the trial judge had in mind when he admitted Dilks' account of the conversations. The issue then is not whether the testimony was hearsay but whether it was relevant to the case. Viewed in this light it may well be that Dilks' testimony was relevant as to Short and Aluise because their acquiescence in the statements made by Dilks, or at least their failure to deny

them, has probative value as an admission. As to Perlstein and Paul, however, a dilemma is presented for if offered as an admission the testimony cannot be received because they were not present when the assertion was made and if offered to prove the truth of the statements it would clearly be hearsay, since the assertor of the facts was not available for cross-examination. The prejudicial character of this testimony as to Perlstein is clear. A natural inference for the jury to draw from it was that Perlstein actively participated in the procurement of leave to install the stills upon city property. Although Perlstein was acquitted upon the second count the damaging effect of the testimony on the first count was not wiped out. The government's theory was that at all times Perlstein actually represented Short and Aluise and that his solicitation of Myers and Graham as clients was for the purpose of representing the latter in such fashion as to prevent identification and possible prosecution of Short and Aluise. Much color was given this theory by testimony that as early as October, 1937, Perlstein was acting on behalf of Short and Aluise to obtain illegal privileges from the county political leader.

■ A written statement by Aluise was secured by government agents December 7, 1939, and was received in evidence over objection by both defendants. The statement contained a reference to Perlstein which was highly prejudicial to him. The colloquy between court and counsel which took place in the absence of the jury discloses that the trial court's intention was to limit the evidentiary value of the statement to Aluise as an admission by the latter but the record fails to disclose that he so instructed the jury. The government argues that the defendants are foreclosed from raising the objection on appeal because they took no exception. Inasmuch as the trial court stated that he would instruct the jury in accordance with defendants' requests there was no ruling to which they could take exception. The failure to restrict the statement was error.

We conclude that because of the admission of the Dilks testimony and the failure to restrict the Aluise statements the conviction of Perlstein must be reversed and a new trial granted as to him.

## Motions for withdrawal of a juror.

■ At the close of the government's case the defendant Paul moved for a directed verdict on the second count and for the withdrawal of a juror on the ground that the trial on both counts seriously prejudiced his rights. The trial court directed a verdict for Paul on the second count and denied the motion for a mistrial. At the close of the entire case the defendant Paul renewed his motion for a mistrial. This motion was likewise denied. In this we think the trial court committed error. The indictment charged Paul with being one of the co-conspirators in the operation of the stills. There was not a scintilla of evidence connecting Paul with this conspiracy. The trial court could not have known from an examination of the indictment that this was so. The prosecution, however, familiar with the proceedings before the grand jury, with the statements of the witnesses, with the exhibits and all the provable facts of its case against each of the defendants, must have known that Paul had absolutely no connection with the conspiracy to operate the stills. The prosecution must also have known that it was neither necessary nor fair that Paul be tried with the others on this count. Indeed, if the indictment had clearly set forth the facts and had omitted Paul as a co-conspirator in the second count it is quite likely that the trial court would have applied the doctrine of McElroy v. United States, 164 U.S. 76, 17 S.Ct. 31, 41 L.Ed. 355, and compelled the government to elect the count upon which it proposed to prosecute or granted a severance. Because of the misleading character of the indictment and the failure of the government counsel frankly to admit his lack of any evidence against Paul the first clear picture of the situation was presented at the close of the government's case. The extent of the prejudice to Paul which resulted from the joint trial cannot now be determined but became obvious in many rulings upon the evidence.

■ Throughout the course of the trial government counsel, over objection, took every available opportunity to introduce the name of Enoch L. Johnson into the proceedings. This reached a climax in a series of questions asked the defendant Paul upon cross-examination.[3] These questions

---

3 "Q. Did you not tell these other witnesses who have testified here about not identifying photographs, not to identify them in order to stop Bob and Mike from talking against those whom you knew to be higher-ups?

were not based upon any matter in the record and were obviously intended to leave with the jury the impression that the defendant was linked to the county political leader in some vast criminal scheme. In Berger v. United States, 295 U.S. 78, 84, 55 S.Ct. 629, 79 L.Ed. 1314, the Supreme Court awarded a new trial based upon its conclusion that the prosecuting attorney in that case "overstepped the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense." What was there said applies with equal force to the case before us.

We conclude that the court erred in failing to withdraw a juror as to Paul and that his conviction must be, therefore, reversed, and a new trial granted as to him.

The judgments of the District Court are reversed and new trials are ordered.

CLARK, Circuit Judge (dissenting).

This is the second [1] criminal case in the writer's short experience on this court that illustrates the force of his words to the American Bar Association. He gives himself the satisfaction of repeating them here: "He would realize that the economic laws to which both of the deans have referred, inevitably operate so that finally the temptation point is reached and that extra legal sardine boils over into sin. As one of our lawyers said, 'There is very little doubt as to the choice between stealing and starving.'" 57 American Bar Association Reports 685, 687.[2]

The attorneys, whose personal tragedy we are now considering, have been convicted on the charge that they, as the indictment puts it, did:

"* * * corruptly endeavor to influence, intimidate and impede * * * witnesses by corrupt promises, offers of inducement, and by other means, and would and did counsel, advise and suggest to * * * witnesses that they testify falsely before * * * Grand Jury with relation to the facts of the matter under inquiry as aforesaid and would and did advise and suggest to * * * witnesses that they should not identify * * * defendants Herbert R. Short and Michael Aluise before * * * Grand Jury as the persons who had in their possession and custody and under their control * * * still set up in the building known as the Garbage Disposal Plant at Absecon Boulevard and North Tennessee Avenue in Atlantic City, New Jersey, as aforesaid, and falsely to deny before * * * Grand Jury that * * * defendants Herbert R. Short and Michael Aluise had any connection with * * * still.

"* * * would and did corruptly influence, obstruct, impede and endeavor to influence, obstruct and impede the due administration of justice in the * * * District Court of the United States for the * * * District of New Jersey by hindering * * * Grand Jury in ascertaining the true facts and presenting a false state of facts with relation to the * * * matter under inquiry in the manner more

---

"Mr. Kisselman: If your Honor please, I anticipate the answer will be 'no,' which, of course, will be agreeable to me, but, I think, this is perhaps the most unfair type of cross-examination I have ever heard. The only time when questions like that are proper is where a foundation has been laid for them.

"The Court: I remember nothing in the record concerning this matter, and I shall not permit the question.

"Q. Mr. Paul, was not the reason you told these witnesses not to identify Bob and Mike because you wanted to protect Enoch L. Johnson, or that you thought you wanted to protect Enoch Johnson?

"Mr. Kisselman: The point is this, this is the same thing. It is an attempt to get this in front of the jury, and the obvious answer is no.

"The Court: Mr. Burns, there is not one word in the record to lay a foundation, for this question.

"Mr. Burns: Well, the purpose is to test the credibility of the witness.

"The Court: I shall refuse to allow it, and shall ask you not to go into it further unless you lay some foundation for it.

*　　*　　*　　*　　*　　*

"Q. And on that day when you put up bail, did you not say to someone that you had been protecting Nucky in this thing?

"Mr. Kisselman: If your Honor please, that is the exact thing which your Honor asked Mr. Burns not to do.

*　　*　　*　　*　　*　　*

"The Court: Mr. Johnson is not on trial in this case, and I am not going to let you go into that."

[1] United States v. Silverman, 3 Cir., 106 F.2d 750.

[2] Speech entitled Overcrowding the Bar before the Section of Legal Education and Admissions to the Bar of the American Bar Association on October 11, 1932.

fully set forth and described in Paragraph 5 hereof, for the purpose of preventing \* \* \* Grand Jury from obtaining evidence upon which an indictment might be returned against the \* \* \* defendants Herbert R. Short and Michael Aluise for violation of the internal revenue laws as aforesaid." Indictment, Paragraphs 5 and 6, Appendix to Appellants' brief, pp. 9, 10.

In other words, those, who both by their solemn oaths of entrance to and by the canons of a learned and honorable profession [3] are bound to uphold justice, come before us now stigmatized by a jury's opinion that they betrayed justice. In supplement to this shocking crime the same indictment charges the defendants with defrauding the revenue by conspiracy to operate a still. I can see no good reason for including this last charge in the indictment. It is true that the crime with whose prosecution they corruptly endeavored to interfere is the crime of illicit distilling. However, a more acute perception of the tactics of some practitioners of criminal law might have suggested the wisdom of trying the offenses separately. Furthermore, it was a quite futile gesture. The jury acquitted one defendant, Perlstein, and the court directed the acquittal of the other, Paul.

The majority express no opinion as to the two defendants' guilt. They feel that the learned trial judge committed errors of law that require the correction of a new trial. It is my opinion that such feeling takes too little account of the modern conception of criminal justice. Professor Wigmore states the matter eloquently in the latest edition of his monumental treatise on evidence. "Secondly, the complaisant sentimentality of judges in criminal cases must cease. Reverence for the Constitution is one thing, and a respect for substantial fairness of procedure is commendable. But the exaltation of technicalities of every sort merely because they are raised on behalf of an accused person is a different and a reprehensible thing. There seems to be a constant neglect of the pitiful cause of the injured victim, and the solid claims of law and order. All the sentiment is thrown to weight the scales for the criminal—that is, not for the mere accused, who may be assumed innocent, but for the man who upon the record plainly appears to be the offender that the jury

have pronounced him to be. We have long since passed the period (as a modern judge has pointed out) 'when it is possible to punish an innocent man; we are now struggling with the problem whether it is any longer possible to punish the guilty.' " 1 Wigmore on Evidence, 3d Ed., § 21, p. 375.

The same theory has found its way into the statutes of the United States.[4] I shall not discuss the history and background of that salutary enactment as I have already done so—speaking that time for a unanimous court.[5]

The majority find four errors, two for each defendant, which they deem, as they must, substantially prejudicial. Two of the errors claimed arise from the use of the name of the county treasurer of the home county of the still. Both references, one by a witness and one by the acting attorney general, are improper. What the witness said is in plain violation of the hearsay rule and therefore incompetent. What the acting attorney general said is irrelevant. It does not follow that the testimony and the question are also prejudicial and so demanding the correction of a reversal.

Appellants' counsel draws a rather gaudy picture of the aforesaid official. He would have us believe that the gentleman combined his work for the county with other more profitable, if less ethical, ventures. What he would have us believe from his brief and what the jury might have believed from the evidence are quite different things. There was no evidence of these extra-curricular activities offered at the trial. The jury's permissible judicial notice is, as in our adversary system it should be, strictly limited. To quote again from Professor Wigmore:

"But the scope of this doctrine is narrow; *it is strictly limited to a few matters* of *elemental* experience in human nature, commercial affairs, and everyday life."

\* \* \* \* \*

"Applying the general principle especially in regard to the element of notoriousness, Courts are found noticing from time to time, a varied array of *unquestionable* facts, ranging throughout the data of commerce, industry, history and natural science." 9 Wigmore on Evidence, 3d Ed., § 2570, p. 544, § 2580, p. 571 (italics ours).

---

[3] Canons of Professional Ethics, American Bar Association, Canon 15, 62 American Bar Association Reports 1105, 1110.

[4] 28 U.S.C.A. § 391.

[5] Townsend v. United States, 3 Cir., 106 F.2d 273.

286

One hopes that a general tendency on the part of county officials to assist criminals is neither as "elemental" nor as "unquestionable" as, for instance, the dangerousness of smoking a pipe in a barn filled with straw.[6] Furthermore, nothing was said by anybody about the residence of the members of the jury whose knowledge of Atlantic County matters is argued for. The only actual evidence besmirching the county treasurer is also hearsay. As it emanated from a government witness it cannot be objected to. Its general tenor was that the latter wanted two of the bootlegging co-conspirators given the facilities of the city garbage dump as a site for the prosecution of their tax saving enterprise.

The testimony improperly admitted amounts, then, to this. The defendant Perlstein has on one occasion visited the office of the treasurer of the county in which he practices law. The defendant Paul has been asked "if he did not want to protect" the same official. The question was held improper by the learned trial judge and was not answered. The jury were entitled to infer that the county treasurer aforesaid regarded the defrauding of the revenue with a tolerant rather than a jaundiced eye and even perhaps that such an attitude on his part deserved the accolade of an indictment for aiding and abetting illicit distilling.

Is this showing of association with and friendliness for such a wicked man "evidence calculated to create prejudice * * by exciting the minds and inflaming the passions of the jury."[7] The writer thinks it is not and for this reason. It may be that as the Latin maxim has it: "Consortio malorum mequoque malum facit".[8] Our law has not gone further than a consideration of what the defendant himself has done. In the European systems and in the Early English practice, particular acts of misconduct were admissible. With the later softening of the criminal law the English courts reverse themselves and excluded the evidence for what Professor Wigmore has termed "reasons of Auxiliary Policy".[9] He says: "It may almost be said that it is because of this indubitable

Relevancy of such evidence that it is excluded. It is objectionable, not because it has no appreciable probative value, but because it has too much. The natural and inevitable tendency of the tribunal—whether judge or jury—is to give *excessive* weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge." 1 Wigmore on Evidence, 3d Ed., § 194, p. 646 (italics ours).

The relevancy and the corresponding undue prejudice both emanate from what the defendant has done and not from whom he has been with. Nor can I find any suggestion in any case that the evil companion plays either a relevant or prejudicial part. Inasmuch as the jury would perceive the first, they could not be affected by the second.

The learned trial judge did not permit the reference to the county treasurer's relations with defendant Paul to go beyond an intimation in a question. The prejudice to him, therefore, if any, is on a different and less extreme footing. There has been much written on misconduct by a prosecuting attorney as ground for reversal. The determining factors seem to be the strength or weakness of the case against the defendant[10] and the measures taken by the trial court to avert the harmful effect.[11] Here the majority agree that the case is strong. The trial judge gave no instruction on the point. Counsel could not have been as much concerned at the trial as he is on appeal for no such request to charge was made. As the court had already reprimanded the assistant attorney general it would surely have been acceded to.

A similar attempt to "speculate on error" is manifest in the second ground found by the majority for reversal as to Perlstein. As is common and almost inevitable in conspiracy cases, an admission by one defendant was offered. The court was asked to limit it to him. The time for such protection is when it is most effective, i. e., just before the jury retires. No request of that character appears

[6] Lillibridge v. McCann, 117 Mich. 84, 75 N.W. 288, 41 L.R.A. 381, 72 Am.St. Rep. 553.

[7] 22 C.J.S., Criminal Law, § 600, p. 922.

[8] "The company of wicked men makes me also wicked", Black Law Dictionary.

[9] 1 Wigmore on Evidence, 3d Ed., §§ 193, 194.

[10] Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314; Fitter v. United States, 2 Cir., 258 F. 567.

[11] State v. Hayes, 109 W.Va. 296, 153 S.E. 496.

among Perlstein's seven requests.[12] So a willing trial judge has to rely on his memory of a long trial. No such reliance is a part of his duty. It is rather the duty of those whose memories are sharpened by the injury done them. In saying that we prefer to ignore the possibility of what judges have called "a studied effort to get reversible error into the record." [13]

The second ground for a new trial for Paul seems to me to involve a misconception of the rule governing the joinder of criminal causes. The writer, speaking then for a unanimous court, discusses that rule in the other lawyer-defendant case he has already referred to.[14] On the authority of that decision the majority reject appellants' argument for a severance. Having done this, it is difficult for me, at least, to follow their subsequent accession to the demand for a mistrial. The best statement I have found of the reason for the joinder rule appears in the note from the Minnesota Law Review quoted in the Silverman opinion.[15] I repeat part of that quotation here: "Apart from statutory limitations, it is submitted that the only fundamental objection to joinder proceeds from the notion that a jury is likely to use evidence adduced in support of one charge to convict accused of another charge not independently nor adequately proved." [106 F.2d 753.] Indictment and Information Joinder of Counts—Statutory Joinder of Separate Offenses in Same Indictment, 22 Minnesota Law Review 112, 113 (note).

That the joinder in the case at bar should be so confusing would seem to be utterly impossible. In the usual case the different counts are left to the jury and because of that fact the trial judge is often not inclined to minimize potential prejudice by his charge. Here, however, the learned trial judge did not permit the jury to pass upon the count for illicit distilling and took great pains to clarify their minds about the lack of connection between the two offenses. He said: " * * * You must not consider whether he [16] was engaged in a conspiracy to operate the still. I have withdrawn that part of the case from you. That was my responsibility, as I have told you. So far as he is concerned in this case, you are to go solely on the issue as to whether or not he is guilty on the first count for interfering with the administration of justice, and you are not to allow the evidence with relation to the setting up and operation of the still, that is the second count, to influence you with regard to his liability on the first count, that is the obstruction of justice count. You must reach your verdict as to Harry Paul's guilt of perpetrating an obstruction of justice solely on the evidence which ties him into that count, leaving out, except for the purpose of taking care of an explanation, all that relates to the operation of the still." Charge of the Court, Appendix to appellants' brief, pp. 544, 545.

It seems clear, therefore, that the jury thoroughly understood its function and that correspondingly its opinion of the defendant Paul's guilt arises not from confusion but from conviction.

---

[12] Appendix to appellants' brief, p. 534.

[13] Appeal and Error—Sufficiency of Objections, 18 Texas Law Review 222 (note).

[14] United States v. Silverman, above cited.

[15] This note was also cited with approval in a recent opinion of the Second Circuit, United States v. Smith, 112 F.2d 83, 85.

